**FOR THE EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| IN RE: BLUE BUFFALO COMPANY, | ) | |
| LTD. MARKETING AND SALES | ) | |
| PRACTICES LITIGATION | ) | Case No.  4:14 MD 2562 RWS |
| | ) | |
| | ) | |
| RELATES TO:   ALL CASES | ) | |

**MEMORANDUM IN SUPPORT OF MOTION**
**FOR FINAL APPROVAL OF CLASS SETTLEMENT**

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................... 1

BACKGROUND AND PROCEDURAL HISTORY ................................................. 1

MATERIAL TERMS OF SETTLEMENT ............................................................... 5

    A.    Class Benefits Include Cash Awards and Injunctive Relief ..................... 5

    B.    Incentive Awards and Attorneys' Fees ................................................... 7

FORM AND MANNER OF CLASS NOTICE ........................................................ 7

WHAT CLASS MEMBERS WILL ACTUALLY RECEIVE UNDER THE
SETTLEMENT ....................................................................................................... 8

ARGUMENT ......................................................................................................... 9

I.    FINAL APPROVAL OF THE SETTLEMENT IS APPROPRIATE
BECAUSE THE SETTLEMENT IS FAIR, REASONABLE AND
ADEQUATE. ................................................................................................. 9

    A.    The Settlement Is An Informed Compromise Resulting From
Arms-Length Negotiation. ...................................................................... 11

    B.    The Potential Success on the Merits Weighed Against the
Settlement Favors Approval. ................................................................... 12

    C.    Defendant's Financial Condition Is Not An Issue, Thus, This
Factor is Neutral. .................................................................................... 15

    D.    Complexity And Further Expense Supports Final Approval. ................... 16

    E.    Settlement Class Members' Reaction Favors Final Approval. ................. 17

II.    THE PROPOSED CLASS SHOULD BE CERTIFIED FOR
SETTLEMENT ............................................................................................ 19

    A.    The Requirements of Rule 23(a) Are Met. .............................................. 20

        1.    Numerosity is satisfied. ................................................................. 20

        2.    Commonality is satisfied. ............................................................... 20

        3.    Typicality is satisfied. .................................................................... 21

        4.    Adequacy is satisfied. .................................................................... 22

    B.    The Requirements of Rule 23(b)(3) Are Met. ......................................... 23

        1.    Predominance is satisfied. .............................................................. 23

        2.    Superiority is satisfied. ................................................................... 24

CONCLUSION ..................................................................................................... 25

## CASES

*Albright v. Bi-State Dev. Agency of Missouri-Illinois Metro. Dist.*,
2013 WL 4855308 (E.D. Mo. Sept. 11, 2013) .......................................................... 10

*Amchem Prods. v. Windsor*,
521 U.S. 591 (1997) .......................................................................................... 20, 23

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,
133 S. Ct. 1184 (2013) ............................................................................................ 23

*Arkansas Educ. Ass'n v. Board of Educ.*,
446 F.2d 763 (8th Cir. 1971) .................................................................................. 20

*Armstrong v. Bd. of Sch. Directors*,
616 F.2d 305 (7th Cir. 1980) .................................................................................. 10

*Barfield v. Sho-Me Power Elec. Co-op.*,
2013 WL 3872181 (W.D. Mo. July 25, 2013) ........................................................ 22

*Bradford v. AGCO Corp.*,
187 F.R.D. 600 (W.D. Mo. 1999) ........................................................................... 20

*Carpe v. Aquila, Inc.*,
224 F.R.D. 454 (W.D. Mo. 2004) ..................................................................... 22, 23

*Carson v. American Brands Inc.*,
450 U.S. 79 (1981) .......................................................................................... 12, 13

*Clark v. Bally's Park Place, Inc.*,
298 F.R.D. 188 (D.N.J. 2014) ................................................................................. 23

*Claxton v. Kum & Go, L.C.*,
2015 WL 3648776 (W.D. Mo. June 11, 2015) ................................................. passim

*Cohn v. Nelson*,
375 F. Supp. 2d 844 (E.D. Mo. 2005) ..................................................................... 16

*Daniels v. Greenkote IPC, Inc.*,
2013 WL 1890654 (E.D. Mo. May 6, 2013) .......................................................... 13

*DeBoer v. Mellon Mortg. Co.*,
64 F.3d 1171 (8th Cir. 1995) ....................................................................... 12, 15, 21

*Doran v. Mo. Dep't of Soc. Servs.*,
251 F.R.D. 401 (W.D. Mo. 2008) ........................................................................... 22

*E.E.O.C. v. McDonnell Douglas Corp.*,
894 F. Supp. 1329 (E.D. Mo. 1995) ................................................................. 11, 15

*Elliott v. Sperry Rand Corp.*,
   680 F.2d 1225 (8th Cir.1982) ........................................................................... 18

*Glen v. Fairway Indep. Mortg. Corp.*,
   265 F.R.D. 474 (E.D. Mo. 2010) ................................................................. 20, 21

*Grunin v. Int'l House of Pancakes*,
   513 F.2d 114 (8th Cir. 1975) ........................................................................... 13

*Hartley v. Suburban Radiologic Consultants, Ltd.*,
   295 F.R.D. 357 (D. Minn. 2013) ..................................................................... 21

*Hicks v. Stanley*,
   2005 WL 2757792 (S.D.N.Y. Oct. 24, 2005) ................................................ 11

*Holden v. Burlington N., Inc.*,
   665 F. Supp. 1398 (D. Minn. 1987) ............................................................... 14

*In re Am. Int'l Grp., Inc. Sec. Litig.*,
   689 F.3d 229 (2d Cir. 2012) ........................................................................... 24

*In re BankAmerica Corp. Sec. Litig.*,
   210 F.R.D 227 F. Supp. 2d 1103 (E.D. Mo. 2002) .................................. 15, 16

*In re Charter Commc'ns Sec. Litig.*,
   2005 WL 4045741 (E.D. Mo. June 30, 2005) ...................................... 10, 11, 12

*In re Checking Account Overdraft Litigation*,
   830 F.Supp.2d 1330 (S.D.Fla.2011) .............................................................. 18

*In re McDonnell Douglas Corp. Sec. Litig.*,
   98 F.R.D. 613 (E.D. Mo. 1982) ..................................................................... 24

*In re Pet Food Products Liab. Lit.*,
   629 F.3d 333 (3d Cir. 2010) ........................................................................... 14

*In re Uponor, Inc., F1807 Plumbing Fittings Products Liab. Litig.*,
   716 F.3d 1057 (8th Cir. 2013) .................................................................. 10, 16

*In re Wireless Tel. Fed. Cost Recovery Fees Litig.*,
   2004 WL 3671053 (W.D. Mo. Apr. 20, 2004) ................................. 9, 15, 16, 19

*In re Zurn Pex Plumbing Prods. Liab. Litig.*,
   2013 WL 716088 (D. Minn. Feb. 27, 2013) ............................................ passim

*Jackson v. Collections Acquisition Co., LLC*,
   2013 WL 5592603 (E.D. Mo. Oct. 9, 2013) .................................................. 24

*Janson v. LegalZoom.com, Inc.*,
   271 F.R.D. 506 (W.D. Mo. 2010) .................................................................. 24

*Jones v. CBE Grp., Inc.*,
   215 F.R.D. 558 (D. Minn. 2003) .................................................................... 24

*Jones v. NovaStar Fin., Inc.*,
    257 F.R.D. 181 (W.D. Mo. 2009) ........................................................................ 20

*Kelly v. Phiten USA, Inc.*,
    277 F.R.D. 564 (S.D. Iowa 2011) ....................................................................... 22

*Knowlton v. Anheuser-Busch Companies, LLC,*
    2014 WL 2009076 (E.D. Mo. May 16, 2014) ..................................................... 20

*Little Rock Sch. Dist. v. Pulaski County Special Sch. Dist. No. 1*,
    921 F.2d 1371 (8th Cir. 1990) ........................................................................ 9, 10

*Marshall v. Nat'l Football League*,
    787 F.3d 502 (8th Cir. 2015) ........................................................... 9, 11, 13, 24

*Morgan v. United Parcel Serv. of Am., Inc.*,
    169 F.R.D. 349 (E.D. Mo. 1996) ....................................................................... 22

*Petrovic v. AMOCO Oil Co.*,
    200 F.3d 1140 (8th Cir. 1999) ........................................................................... 11

*Prater v. Medicredit, Inc.*,
    2015 WL 4385682 (E.D. Mo. July 13, 2015) ..................................................... 10

*Ramsey v. Sprint Commc'ns Co., L.P.*,
    2012 WL 6018154 (D. Neb. Dec. 3, 2012) .................................................. 15, 16

*Risch v. Natoli Eng'g Co., LLC*,
    2012 WL 3242099 (E.D. Mo. Aug. 7, 2012) ...................................................... 10

*Risch v. Natoli Engineering Co.. LLC*,
    2012 WL 4357953 (E.D. Mo. Sep. 24, 2012) ..................................................... 12

*Schmidt v. Fuller Brush Co.*,
    527 F.2d 532 (8th Cir. 1975) ............................................................................. 10

*Simmons v. Enter. Holdings, Inc.*,
    2012 WL 718640 (E.D. Mo. Mar. 6, 2012) ........................................................ 10

*Simmons v. Enter. Holdings, Inc.*,
    2012 WL 2885919 (E.D. Mo. July 13, 2012) ..................................................... 12

*Sullivan v. DB Investments, Inc.*,
    667 F.3d 273 (3d Cir. 2011) .............................................................................. 24

*Van Horn v. Trickey*,
    840 F.2d 604 (8th Cir. 1988) ....................................................................... 11, 18

*Wal-Mart Stores, Inc. v. Dukes*,
    131 S. Ct. 2541 (2011) ...................................................................................... 20

*White v. Martin*,
    2002 WL 32596017 (W.D. Mo. Oct. 3, 2002) ................................................... 22

**STATUTES**

28 U.S.C. § 1715.........................................................................................................19

California Business and Professions Code § 17200 ......................................1

California Business and Professions Code § 17500 ......................................1

California Civil Code § 1750...........................................................................1

New York General Business Law § 349.........................................................1

New York General Business Law § 350.........................................................1

**RULES**

Fed. R. Civ. P. 23.................................................................................passim

## INTRODUCTION

Plaintiffs seek final approval of their Settlement[1] with The Blue Buffalo Company Ltd ("Blue Buffalo" or "Defendant"). Under Rule 23, final approval of a class action settlement is appropriate if that settlement is fair, reasonable, and adequate. This Settlement exceeds this standard, achieving significant monetary relief, as well as meaningful injunctive relief, for the class without the delay and risks associated with continued litigation. The Settlement Class meets all of the requirements for certification, and the Settlement is patently fair under the prevailing law in this circuit.

With the final approval of the Settlement that Plaintiffs seek, over 100,000 claimants stand to collectively receive over $22 Million in cash benefits from the settlement fund. Only 16 timely objections to the Settlement were received (including 5 from "serial objectors"), and only 8 opt-outs sought exclusion. Thus, less than 00.02% of responding class members have objected and almost 14,000 times more class members submitted a claim than opted out.

## BACKGROUND AND PROCEDURAL HISTORY

Beginning on May 7, 2014, consumers in several states filed a series of class actions challenging the veracity of certain claims made by Blue Buffalo regarding the ingredients in its pet foods. On October 17, 2014, the Judicial Panel on Multidistrict Litigation centralized these actions against Blue Buffalo in this Court. *See* Dkt. No. 1. On January 30, 2015, Plaintiffs filed their Consolidated Class Action Complaint, which asserts claims against Blue Buffalo under numerous federal and state consumer protection laws.[2] *See* Dkt. No. 36.[3] Plaintiffs allege, *inter*

---

[1]      All capitalized terms are terms used in the Stipulation of Settlement (Dkt. No. 160-1).

[2]      The Complaint asserts claims for violations of the Magnuson-Moss Warranty Act, Missouri Merchandising Practices Act, New York General Business Law § 349 (New York Deceptive Trade Practices Act), New York General Business Law § 350 (New York False Advertising Law), California Civil Code § 1750 *et seq.* (Consumers Legal Remedies Act or "CLRA"), California Business and Professions Code § 17200 *et seq.* (Unfair Competition Law or "UCL"), California Business and Professions Code § 17500 *et seq.* (False Advertising Law or "FAL"), New Jersey Consumer Fraud Act, New Jersey Truth-In-Consumer Contract, Warranty and Notice Act, Illinois Unfair Practices Act,

*alia*, that Blue Buffalo breached its "True Blue Promise." The True Blue Promise states that Blue Buffalo Products contain "NO Chicken or Poultry By-Product Meals," "NO Corn, Wheat or Soy," and "NO Artificial Preservatives, Colors or Flavors." Compl. ¶ 3. Plaintiffs assert that, contrary to the True Blue Promise, the Blue Buffalo Products did in fact contain significant amounts of chicken/poultry by-product meal, corn, rice, grains, soy, and/or artificial ingredients.

Blue Buffalo answered the initial Consolidated Complaint on March 20, 2015. *See* Dkt. No. 45. It denied the material allegations of the Consolidated Class Action Complaint and any and all liability with respect to all facts and claims alleged, and continues to deny that any Settlement Class Member has suffered any harm or damage, or is entitled to any monetary or other relief whatsoever in connection with the Action. *See* Stipulation of Settlement (Dkt. No. 160-1) at 2. However, on May 9, 2015, Blue Buffalo admitted that, for a period of time ending in May 2014, in violation of Blue Buffalo's procurement contracts and ingredient specifications, a major supplier of ingredients to Blue Buffalo and many other pet food companies sent mislabeled ingredients to manufacturing facilities that produce certain Blue Buffalo pet food products. As a result of this misconduct, on June 12, 2015, Blue Buffalo filed a third party complaint in this Action against Wilbur-Ellis Company ("Wilbur-Ellis") and Diversified Ingredients, Inc. ("Diversified"), seeking indemnification and/or contribution for any liability that Blue Buffalo may have on account of these actions. Dkt. No. 61.

---

Florida's Deceptive and Unfair Trade Practices Act, Ohio Consumer Sales Practices Act, and for Breach of Express Warranty, Breach of Implied Warranty of Merchantability, and Unjust Enrichment.

[3]     In connection with the Settlement, and with leave of Court, Plaintiffs filed a First Amended Consolidated Class Action Complaint ("Compl.") on December 21, 2015. Dkt. No. 165. The Amended Complaint corrects a typographical error, adds an additional Class Representative, amends the class definition, and adds an additional claim under the Massachusetts Consumer Protection Act, among other conforming edits. *See* Memorandum In Support Of Motion For Preliminary Approval Of Class Settlement, Certification Of Settlement Class, And Permission To Disseminate Class Notice (Dkt. No. 159) ("Prelim. Approval Mem.") at 2 n.3.

Class Counsel, along with Court appointed Liaison Counsel and members of the Executive Committee ("Leadership"), devoted substantial time and resources to investigating and litigating this case. *See* Declaration of Deborah Kravitz ("Kravitz Decl."), attached as Exhibit 1, at ¶6 ("Kravitz Decl.").[4] Counsel spent significant time communicating with plaintiffs, investigating facts, researching the law, and preparing a Consolidated Class Action Complaint (Dkt. No. 36) containing multiple counts, including consumer act claims under the laws of seven (now eight) states. Counsel prepared and served initial disclosures, interrogatories and two sets of document requests; responded to discovery requests, including interrogatories to each named plaintiff; raised and resolved document discovery disputes among counsel for the parties; reviewed and coded over 155,000 documents; served third-party subpoenas; obtained and digested key deposition transcripts of depositions taken in *Nestle Purina Petcare Company v. The Blue Buffalo Company Ltd.*, No. 4:14-cv-00859-RWS; and noticed and prepared for numerous depositions. Kravitz Decl. at ¶7. In addition to this discovery, Class Counsel also retained and consulted with expert witnesses, commissioned independent testing of Blue Buffalo's products to test representations made by Blue Buffalo, and researched and began drafting Plaintiffs' motion for class certification, which was due to be filed by December 18, 2015. *Id.* at ¶8. Although the Purina case was first filed, Class Counsel here mounted its own independent investigation and, while leveraging information gleaned from the Purina case to Plaintiffs' advantage, vigorously litigated its own case on its own terms, according to its own agenda.

While vigorously litigating this case, Class Counsel also conducted settlement negotiations. The parties engaged in a day-long mediation before former United States District Judge Wayne A. Andersen in Chicago, Illinois on October 26, 2015. Kravitz Decl. ¶¶ 10-11. Class Counsel

---

[4]    For additional detail, *see also* the Declaration of Scott A. Kamber in Support of the Fee Application, filed concurrently with the Fee Application.

entered the mediation fully informed of the merits of the Class Members' claims, and negotiated the proposed Settlement while zealously advancing the position of Plaintiffs and Class Members. Counsel was fully prepared to continue to litigate rather than accept a settlement that was not in the best interest of Plaintiffs and Class Members. In the opinion of Class Counsel, the work performed prior to the mediation, with a leadership team rich in experienced trial lawyers, persuasively demonstrated that Plaintiffs were ready, willing, and able to certify a class and take this case to trial. Kravitz Decl. ¶¶ 12-14. Judge Andersen actively supervised and participated in the settlement discussions to help the parties reach an acceptable compromise. Although an agreement was not reached that day, Class Counsel, with the continued assistance of Judge Andersen, was able to negotiate the instant Settlement notwithstanding the complexities of the case, the damages analyses at issue, and the involvement of the third-party defendants. *See Id.* at ¶¶ 14-16. After much arms-length negotiation, and the assistance of Judge Andersen, the parties achieved an understanding in principle to resolve the litigation. That understanding was then translated, over a period of weeks and numerous drafts, into a Settlement that provides significant cash compensation to Settlement Class Members, as well as injunctive relief, and which avoids the risks and delay of further litigation. Kravitz Decl. ¶17.

On December 9, 2015, Plaintiffs filed their motion and supporting memorandum seeking preliminary approval of the settlement, certification of a settlement class, and permission to disseminate class notice. Dkt. No. 159. On December 18, 2015, this Court conditionally certified for settlement purposes a Settlement Class of:

> All residents of the United States of America who, from May 7, 2008 through the Preliminary Approval Date, purchased any of the Blue Buffalo Products [listed on Ex. 1 to the Settlement Agreement].

Dkt. No. 164 at 2.[5]  The Court also granted preliminary approval of the Settlement, approved the proposed Claim Form, Media Plan, Publication Notice, Class Notice, and creation of the Settlement Website.  *Id.* at 2-4.  Notice to class members was accomplished by extensive direct and indirect notice campaigns designed to meet the requirements of due process, as further detailed below.  The fairness hearing is scheduled for May 19, 2016.  Dkt. No. 164 at 7.

## MATERIAL TERMS OF SETTLEMENT

### A.    Class Benefits Include Cash Awards and Injunctive Relief

Under the Settlement, Blue Buffalo will provide both monetary and non-monetary benefits to the Settlement Class.  Blue Buffalo has paid $32 million in cash into a Settlement Account available for class members.  *See* Stipulation of Settlement (Dkt. 160-1) at §§1.27, 2.4-2.5.  The $32 million is exclusive of Incentive Awards to Class Representatives, which Blue Buffalo will pay separate from, and in addition to, the fund amount.  *Id.*  There is no potential reversion of funds to Blue Buffalo. After payment of fees and costs, the Settlement contemplates that all available funds will be distributed to Settlement Class Members.[6] Each Settlement Class Member may submit a claim that will, if timely and valid, entitle the Class Member to a cash payment, according to which Option s/he chooses in submitting a Claim Form.  Subject to potential adjustment as described in the Settlement, monies will be distributed to Settlement Class Members pro rata based on the amounts apportioned to each Settlement Class Member by the claims process detailed in the Preliminary Approval Order and Notice. In short, the claims

_____

[5]     Excluded from the class are: a) Released Persons; b) The Court and its personnel; c) All persons who have timely elected to exclude themselves from the Settlement, pursuant to the procedures set forth in Paragraph 5.4 of the Settlement Agreement who, thereupon, shall no longer be Settlement Class Members, shall not be bound by this Settlement Agreement or eligible to make a claim for any benefit under the terms of the Settlement Agreement; d) Class Counsel and Supporting Counsel.  Dkt. No. 164 at 2.

[6]     Pursuant to the Stipulation of Settlement (Dkt. 160-1) at §2.10, any unpaid funds remaining from uncleared checks shall remain in the Settlement Fund pending further order of the Court. If any unpaid funds from uncleared checks remain in the Settlement Fund, Class Counsel shall make an application to the Court for a proposed disposition of the unpaid funds. Such proposed disposition may not include any additional payment to Counsel. There is no amount of the settlement allocated to cy pres.

process provides for a cash payment of up to ten percent of purchases for all class members. Option one provides that class members without valid proof of purchase may receive ten percent for up to $100 in eligible purchases. Option two provides that class members with valid proof of purchase may receive ten percent for up to $2000 in eligible purchases. These payments are subject to pro rata adjustment to ensure that all available funds are paid to class members filing a claim. Stipulation of Settlement (Dkt. No. 160-1) at §2.7, §2.8.

Based on the number of actual claims submitted, Class Members will in fact receive a pro rata **increase** to the cash payments contemplated by the Stipulation of Settlement. *See* Declaration of Jeanne C. Finegan, APR Concerning Implementation and Adequacy of Class member Notice Program ("Finegan Decl."), attached hereto as Ex. 2, at ¶ 45-46. As discussed in detail below, the pro rata increase means that class members will receive no less than their entire purchase price back, subject to the valid eligible purchase amounts set forth in Options one and two. *Id*. & n.12-13.

The Settlement also provides meaningful injunctive relief. This component of the Settlement requires Blue Buffalo to ensure that it no longer represents to the public that the Blue Buffalo Products do not include chicken or poultry by-product meal unless or until: "(i) All specifications for Blue Buffalo Products have been reviewed for the purpose of ensuring that they are consistent with all packaging claims found on the product and representations regarding the products found on the Blue Buffalo website; and (ii) Blue Buffalo has reviewed its supplier relationships and has instituted practices designed to ensure that all materials provided by its suppliers comply with the applicable product specifications." Stipulation of Settlement (Dkt. No. 160-1) at §2.1.

## B.    Incentive Awards and Attorneys' Fees

Under the Settlement, Blue Buffalo has agreed to pay $1,500 to each named class representative.  Stipulation of Settlement (Dkt. 160-1) at §§2.3, 2.4, 3.2.  Such payments are separate from, and in addition to, the $32 million settlement fund.  *Id.*  Class Counsel will request fees and costs of no more than 25% of the gross settlement fund (exclusive of any interest accumulated, in that fund) or $8,000,000.  *See id.* at §§1.24, 3.1.  A separate motion for fees is filed contemporaneously with this motion for Final Approval.

## FORM AND MANNER OF CLASS NOTICE

The parties proposed and the Court approved Heffler Claims Group ("HCG") as Settlement Administrator, as well as the Notice and Media plan described in the Finegan Decl., attached to the Stipulation of Settlement, and Settlement Website.  *See* Dkt. No. 164 at 3-4.  The state-of-the-art notice campaign, executed precisely in conformance with the terms of the Preliminary Approval Order, was extensive, and included direct notice, publication notice, and online and mobile advertising.  HCG sent out nearly two million direct notices by e-mail or postcard, which appeared to be delivered successfully.  *See* Finegan Decl. ¶¶ 22-30.  The direct notice program reached an estimated 56 percent of the class.  *Id.* ¶ 30.  In addition, a black and white ½ page advertisement was published in People Magazine, which reports a circulation of more than 3.5 million people, with over 42 million readers.  *Id.* ¶ 32.  Heffler also caused online banner advertisements to be placed on highly targeted Internet networks, and had specific search terms related to the Settlement incorporated in Google AdWords.  The banner ads were served across more than 5,467 websites, and more than 78,500,000 Internet impressions were served on the Internet.  *Id.* ¶33.  Heffler also engaged in a highly successful supplemental Claim Stimulation Program, which consisted of advertising on an additional online ad network and two additional social medial channels – Facebook and Twitter.  *Id.* ¶35. Heffler also issued a press

release and launched an official settlement website. *Id.* ¶¶38-40. As of April 14, 2016, the Settlement was mentioned in more than 182 news publications and was shared more than 100,000 times on social media. *Id.* ¶38. Overall, the Settlement Administrator believes the notice program as a whole reached 87% of the class with an average frequency of 4 times. *Id.* ¶49.

## WHAT CLASS MEMBERS WILL ACTUALLY RECEIVE UNDER THE SETTLEMENT

As of May 9, 2016, 105,172 claims have been made. Id. ¶42.[7] As set forth in the Affidavit of Michael D. Pakter ("Pakter Aff."), attached hereto as Ex. 3, and the Finegan Decl., the actual claims experience will pay class members who filed a claim far more than they could have received even had plaintiffs prevailed in a full trial on the merits. Based on an economic analysis (solely of the cash portion) of the settlement, Mr. Pakter calculated that, without discounting for probability of success at trial, if an individual prevailed at trial, exhausted all appeals, and waited out the claims administration process (no less than a 28 month delay in receipt of funds as compared to a settlement now), an average class member who purchased $100 worth of Blue Buffalo pet food would likely receive a $10 recovery, which when discounted to present value would equate to a present payment of only $7.65. Pakter Aff. ¶¶22-28. ("a rational economic actor who had 100% chance of recovery at trial would take $7.65 today, versus $10.00 at the end of twenty-eight months at the end of trial, all appeals, and the claims administration process").

However, under the terms of the Settlement, and in light of the pro rata adjustment to claims, the same hypothetical class member would actually receive the full value of a valid $100

---

[7]     Of the 105,172 total claims received as of May 9, 2016, 4,281 claims were received after April 14, 2016. Finegan Decl. ¶42.  Because the additional 4,281 claims received after April 14, 2016 do not materially change the amount of pro rata adjustment each claim received in HCG's calculations, HCG has included all 105,172 claims in its analysis. *Id.*

purchase claim, regardless of whether the claim is filed under Option 1 or Option 2. Id. ¶28 ("Irrespective of which option a Class Member who submitted a claim for $100 in purchases would select, in actual practice in this settlement, the Class Member would receive $100.00). See also Finegan Decl. ¶¶43, 45-46 ("Under conservative assumptions of notice prior to any necessary Pro Rata Adjustment, each class member would have been paid 10 percent of their purchase price. This would have yielded a maximum payout of $10 for Option 1 Claimants and $200 for Option 2 claimants. Based upon the actual claims experience, all valid claimants will now be paid their full valid/normalized claim amount, plus an approximate pro rata increase of 11 percent over their valid claimed purchase amount."). As result, the immediate and substantial benefits of the Settlement today far outweigh the speculative recovery a class member may receive down the road, even if an optimal recovery were to be had at trial. *In re Wireless Tel. Fed. Cost Recovery Fees Litig.*, No. MDL 1559 4:03-MD-015, 2004 WL 3671053 (W.D. Mo. Apr. 20, 2004) ("In contrast to the delay and uncertainty attendant with such litigation, the Settlement Agreement provides substantial and immediate benefits.").

## ARGUMENT

### I. FINAL APPROVAL OF THE SETTLEMENT IS APPROPRIATE BECAUSE THE SETTLEMENT IS FAIR, REASONABLE AND ADEQUATE.

The law favors settlement. *See Little Rock Sch. Dist. v. Pulaski County Special Sch. Dist. No. 1*, 921 F.2d 1371, 1383 (8th Cir. 1990) ("The law strongly favors settlements. Courts should hospitably receive them . . . As a practical matter, a remedy that everyone agrees to is a lot more likely to succeed than one to which the defendants must be dragged kicking and screaming."). The policy favoring settlement "is particularly strong in the class action context." *In re Zurn Pex Plumbing Prods. Liab. Litig.*, No. 08–MDL–1958 ADM/AJB, 2013 WL 716088, at *6 (D. Minn. Feb. 27, 2013). "Class actions, in general, 'place an enormous burden of costs and expense upon [ ] parties.'" *Marshall v. Nat'l Football League*, 787 F.3d 502, 512 (8th Cir. 2015) (quoting

*Schmidt v. Fuller Brush Co.*, 527 F.2d 532, 535 (8th Cir. 1975)). Settlement avoids protracted litigation and conserves resources. *See In re Uponor, Inc., F1807 Plumbing Fittings Products Liab. Litig.*, 716 F.3d 1057, 1063 (8th Cir. 2013) (expense of continued litigation "weigh[s] in favor of" approving settlement).[8]

The policy favoring class action settlement is so strong that such agreements are often deemed "presumptively valid." *See Little Rock Sch. Dist.*, 921 F.2d at 1391. "Rule 23(e) requires the court to intrude on th[e] private consensual agreement merely to ensure that the agreement is not the product of fraud or collusion and that, taken as a whole, it is fair, adequate, and reasonable to all concerned." *In re Wireless Tel.*, 396 F.3d at 934.

In the Eight Circuit, the fairness of a settlement is evaluated according to four primary factors: "(1) the merits of the plaintiff's case, weighed against the terms of the settlement; (2) the defendant's financial condition; (3) the complexity and expense of further litigation; and (4) the amount of opposition to the settlement." *In re Wireless Tel. Fed. Cost Recovery Fees Litig.*, 396 F.3d 922, 932 (8th Cir. 2005); *accord Risch v. Natoli Eng'g Co., LLC*, 4:11CV1621 AGF, 2012 WL 3242099, at *2 (E.D. Mo. Aug. 7, 2012); *Simmons v. Enter. Holdings, Inc.,* 2012 WL 718640, at *2 (E.D. Mo. Mar. 6, 2012). Other factors include: fraud or collusion; complexity, expense, and likely duration of the litigation; stage of the proceedings; and the opinions of class counsel and representatives. *Albright v. Bi-State Dev. Agency of Missouri-Illinois Metro. Dist.*, 2013 WL 4855308, at *3 (E.D. Mo. Sept. 11, 2013); *Prater v. Medicredit, Inc.*, 2015 WL

---

[8]  *See also In re Charter Commc'ns Sec. Litig.*, No. 4:02-cv-1186-CAS, 2005 WL 4045741, at *4 (E.D. Mo. June 30, 2005) ("In the class action context in particular, there is an overriding public interest in favor of settlement . . . Settlement of the complex disputes often involved in class actions minimizes the litigation expenses of both parties and also reduces the strain such litigation imposes upon already scarce judicial resources.") (quoting *Armstrong v. Bd. of Sch. Directors*, 616 F.2d 305, 313 (7th Cir. 1980)) (internal quotation marks omitted). "The complexity and expense of class action litigation is well-recognized" and "various procedural and substantive defenses . . . the expense of proving class members' claims, the certainty that resolution under [a] settlement will foreclose any subsequent appeals, and the fear that, unsettled, the 'ultimate resolution of the action . . . could well extend into the distant future,' all weigh in favor of the settlement's approval." *Claxton v. Kum & Go, L.C.*, 6:14-CV-03385-MDH, 2015 WL 3648776, at *6 (W.D. Mo. June 11, 2015) (quoting *In re Zurn Pex*, 2013 WL 716088, at *7).

4385682, at *2 (E.D. Mo. July 13, 2015). Each of these factors weighs in favor of granting final approval.

The court "begin[s] with the guiding principle that 'a class action settlement is a private contract negotiated between the parties.'" *Marshall* 787 F.3d at 509  (quoting *In re Wireless*, 396 F.3d at 934).  "The court's role in reviewing a negotiated class settlement is to ensure that the agreement is not the product of fraud or collusion and that, taken as a whole, it is fair, adequate, and reasonable to all concerned." *Id.* (internal quotation omitted).  While it should reach "well-reasoned conclusions," a district court "need not make a detailed investigation consonant with trying the case." *In re Wireless,* 396 F.3d at 932-33 (quoting *Van Horn v. Trickey*, 840 F.2d 604, 607 (8th Cir. 1988) (citations omitted); *accord Marshall*, 787 F.3d at 518 ("the district court need not undertake the type of detailed investigation that trying the case would involve.") (internal quotation omitted).  Moreover, "judges should not substitute their own judgment as to optimal settlement terms for the judgment of the litigants and their counsel." *Petrovic v. AMOCO Oil Co.*, 200 F.3d 1140, 1148-49 (8th Cir. 1999).  "[T]here is a presumption of fairness when a settlement is negotiated at arm's length by well-informed counsel." *In re Charter Commc'ns*, 2005 WL 4045741, at *5. And, the assistance of a neutral mediator is strong evidence of a lack of collusion. *Hicks v. Stanley*, No. 01 CIV. 10071 (RJH), 2005 WL 2757792, at *5 (S.D.N.Y. Oct. 24, 2005) ("The participation of a respected and neutral mediator 'gives [the court] confidence that [the negotiations] were conducted in an arms-length, non-collusive manner.'") (internal citation omitted).

## A. The Settlement Is An Informed Compromise Resulting From Arms-Length Negotiation.

The stage of the instant proceedings favors settlement because the parties have sufficiently developed their case to be apprised of the risks, but have not engaged in such protracted litigation as to make settlement unavailing. *See E.E.O.C. v. McDonnell Douglas*

*Corp.*, 894 F. Supp. 1329, 1334 (E.D. Mo. 1995) (approving settlement where investigation was "to a point at which an informed assessment of its merits and the probable future course of the litigation can be made."); *Risch v. Natoli Engineering Co., LLC*, 2012 WL 4357953 (E.D. Mo. Sep. 24, 2012) (Plaintiffs "developed their case[] enough to know the potential recovery and the relative risks of proceeding to trial with their claims, yet the litigation was not so advanced or unduly prolonged that the parties cannot realize significant benefits by settling before [dispositive motions] and trial."). Here, Plaintiffs' Counsel has devoted substantial time and resources to investigating, litigating, and resolving this case. *See e.g.* Kravitz Decl. ¶¶7-17.

The Settlement also "was reached by well informed and experienced counsel." *In re Charter Commc'ns*, 2005 WL 4045741, at *6. Moreover, there has been no fraud or collusion. Rather, the parties engaged in substantial, arms-length negotiation spanning several weeks with the active participation of Judge Anderson, a neutral mediator. Kravitz Decl. ¶9-17. The active assistance of a neutral mediator is a strong indicator of lack of collusion and arms-length negotiation. *DeBoer v. Mellon Mortg. Co.*, 64 F.3d 1171, 1178 (8th Cir. 1995); *see also Claxton*, 2015 WL 3648776, at *6 (approving settlement as "a product of extensive negotiation . . . and requiring the services of a mediator"); *Simmons v. Enter. Holdings, Inc.*, No. 4:10CV00625AGF, 2012 WL 2885919, at *2 (E.D. Mo. July 13, 2012) (settlement reached "only after they participated in mediation sessions with an experienced mediator."). The Settlement reflects extensive, serious, and arms-length negotiation, and as such, is entitled to a presumption of fairness.

**B.     The Potential Success on the Merits Weighed Against the Settlement Favors Approval.**

The fairness of the settlement also is determined by, among other things, weighing the likelihood of success on the merits against the amount of the relief offered in the settlement. *See Carson v. American Brands Inc.*, 450 U.S. 79, 88 n. 14 (1981) (discussing settlement of Title VII

claims). In determining whether to approve a settlement, however, the court should "not decide the merits of the case or resolve unsettled legal questions." *Id.*; *Marshall*, 787 F.3d at 518 ("To require the district court to make detailed factual findings on the value of class claims in every case . . . would run counter to this Court's guiding principle that '[t]he very purpose of compromise is to avoid the delay and expense of such a trial.") (quoting *Grunin v. Int'l House of Pancakes*, 513 F.2d 114, 124 (8th Cir. 1975)). Courts also may rely on the judgment of experienced counsel as to the merits of a class action settlement. *Daniels v. Greenkote IPC, Inc.*, No. 4:10 CV 1954 DDN, 2013 WL 1890654, at *2 (E.D. Mo. May 6, 2013).

While Plaintiffs believe they have a strong case on the merits, they also are cognizant of the considerable risks of further litigation. Defendant has presented a number of defenses, and Plaintiffs also have considered the hurdles in seeking to certify a nationwide class (or multiple state classes). Even if litigation classes were certified, the risk of losing on the merits would remain, whether at summary judgment or trial. At all times, Blue Buffalo has denied liability, objected to the merits of Plaintiffs' case, and asserted multiple affirmative defenses. It continues to deny that class members have suffered any harm or damage or are entitled to monetary or any relief whatsoever in connection with the Action. While admitting that, for a period of time, a supplier sent mislabeled ingredients to manufacturing facilities that produced certain products, Blue Buffalo maintains that this was without its knowledge and in violation of procurement contracts and ingredient specifications. Blue Buffalo has also filed third-party complaints, which will likely render continued litigation increasingly expensive and complex. *See* Stipulation of Settlement (Dkt. No. 160-1) at 2-3. Thus, for all of the reasons discussed in requesting preliminary approval, there are real risks associated with the merits, class certification, and potential appeals. *See* Prelim. Approval Mem. (Dkt. No. 159) at 12-14.

Weighing the risks of litigation against the expected recovery to Class Members also favors final approval. Plaintiffs' estimate of the potential compensatory damages they could possibly recover at trial, in a best-case scenario based upon discovery and analysis of available information, yields a damages figure of approximately $150,000,000 (sometime in the future after trial, appeals, and a claims administration process), which when discounted to present value yields a damages figure of $115,000,000. See Pakter Aff. ¶¶ 14-20. An economic analysis of the Settlement provides that the $32 million Settlement Fund amount is approximately 27% of the present value of the maximum possible full verdict at trial. *See* Pakter Aff. at ¶21.

Because there are substantial risks as to whether Plaintiffs could successfully certify and maintain a class, let alone prevail at trial and on appeal, a settlement at this stage, which reflects an amount that is 27% of the maximum compensatory recovery, is a compromise well within the fair and reasonable range.[9] Moreover, because there will be a pro rata increase in the settlement awards, the actual recovery by individual class members who filed claims will in many cases approach 100%. *See* Pakter Aff. ¶¶24-29.

Thus, the Settlement offers immediate compensation to class members without the risks associated with further litigation, trial, and appeal. Although Plaintiffs believe they would prevail, there are clear uncertainties. As courts recognize, such uncertainties:

> [S]trongly indicate that the value of this settlement is substantial and brings real and immediate benefits to the settlement class. While they may well not get anything if the case were to go forward or, if they did receive some benefits, may well not receive

---

[9] *See*, *Holden v. Burlington N., Inc.*, 665 F. Supp. 1398, 1414 (D. Minn. 1987) ("A cash settlement amounting to only a fraction of the potential cash recovery . . . does not in itself render the settlement unfair or inadequate. 'In fact there is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery.'") (internal citations omitted); *In re Pet Food Products Liab. Lit.*, 629 F.3d 333 (3d Cir. 2010) (approving in part a far-reaching settlement providing a $24 million fund for economic damage suffered by pet owners whose pets consumed contaminated foods), *on remand* the district court found that a $250,000 allocation for purchase claims was fair, reasonable and adequate. 2011 WL 1322878, at *3 (D.N.J. Apr 5, 2011).

> anything until years into the future after millions of dollars have
> been spent.

*In re Wireless Tel. Fed. Cost Recovery Fees Litig.*, MDL 1559 4:03-MD-015, 2004 WL 3671053, at *10 (W.D. Mo. Apr. 20, 2004). *Cf. In re BankAmerica Corp. Sec. Litig.*, 210 F.R.D. at 701 (considering "the vagaries of litigation and compar[ing] the significance of immediate recovery by way of compromise to the mere probability of relief in the future, after protracted and expensive litigation.") (citations and internal quotations omitted) (*settlement approved at* 227 F. Supp. 2d 1103 (E.D. Mo. 2002)). The relief obtained, when weighed against the complexities and uncertainties of litigation, and the certainty of lengthy litigation in the absence of a settlement, support the conclusion that the Settlement is fair, reasonable, and adequate.

The parties and their respective counsel, having taken the risks and benefits into consideration, agree that the Settlement is fair and reasonable, and these views are entitled to considerable weight. *DeBoer*, 64 F.3d at 1178; *In re Zurn Pex*, 2013 WL 716088, at *6; *E.E.O.C.*, 894 F. Supp. at 1335.

### C. Defendant's Financial Condition Is Not An Issue, Thus, This Factor is Neutral.

Pursuant to the terms of the Stipulation of Settlement, §2.5, Blue Buffalo has already deposited $32 Million into the Settlement Fund. Kravitz Decl. ¶18. Its only remaining financial obligation is to pay incentive awards to the named representatives, if the Court approves such payments. As Blue Buffalo has already satisfied its main financial settlement obligations, and there is no indication that it would be unable to make the incentive awards, this factor is not an issue. *See In re Wireless Tel.*, 396 F.3d at 933. (approving settlement and finding "there is no indication that Nextel's financial condition would prevent it from raising the settlement amount"); *Ramsey v. Sprint Commc'ns Co., L.P.*, 2012 WL 6018154, at *3 (D. Neb. Dec. 3,

2012) (approving settlement absent evidence "calling into question the defendants' overall financial condition and ability to pay").

### D. Complexity And Further Expense Supports Final Approval.

"It is the surety of settlement that makes it a favored policy in dispute resolution as compared to unknown dangers and unforeseen hazards of litigation." *In re Wireless Tel.,* 2004 WL 3671053, at *11 (citing *In re BankAmerica,* 210 F.R.D. at 701) (recognizing it is often "proper to take the bird in hand instead of a prospective flock in the bush."). By reaching a negotiated Settlement, Plaintiffs have avoided significant risk and delay, and ensured a recovery to the Settlement Class. Blue Buffalo has alleged numerous legal and factual defenses that, absent settlement, will require full discovery, including numerous depositions, briefing, and additional pre-trial work. Class certification, expert discovery, and summary judgment motions are just a few of the matters that would ensue, in addition to a trial and possible appeals. Additional work may also include pre-trial motions, post-trial motions, and thousands more hours of attorney time. Not surprisingly, courts look upon such factors as weighing heavily in favor of settlement. *See In re Uponor,* 716 F.3d at 1063 (complexity and expense of further litigation "weigh[s] in favor of approval."); *Claxton*, 2015 WL 3648776, at *6 ("The complexity and expense of class action litigation is well-recognized" and "various procedural and substantive defenses[,] . . . the expense of proving class members' claims, the certainty that resolution under [a] settlement will foreclose any subsequent appeals, and the fear that, unsettled, the 'ultimate resolution of the action . . . could well extend into the distant future,' all weigh in favor of the settlement's approval.") (quoting *In re Zurn Pex*, 2013 WL 716088, at *7).[10]

---

[10] *See also*, *e.g.*, *Ramsey*, 2012 WL 6018154, at *3 ("should this settlement be rejected, there is no telling what it would take to get it to trial, or how the issues presented at that trial would be litigated."); *Cohn v. Nelson*, 375 F. Supp. 2d 844, 859-60 (E.D. Mo. 2005) ("in the absence of the Settlement in this case, it is likely that further litigation would have been complex, expensive, and time consuming. Settlement under such circumstances is clearly favored").

**E.** **Settlement Class Members' Reaction Favors Final Approval.**

In assessing class members' reaction to a settlement, the court looks to fairness to the class as a whole, not particular class members. *Marshall*, F.3d at 519-20. The extremely low rate of objections and opt-outs demonstrates that Class Members overwhelmingly favor the settlement.[11] *See* Finegan Decl. ¶ 48 (HCG received only eight requests for exclusion). Although 16 timely objections were received[12]—representing .01% of the claims filed— 2 objectors indicated an intent to withdraw their objections. See Declaration of Joseph I. Marchese ("Marchese Decl."), attached hereto as Ex.4 (Objectors Johnson (Dkt. No. 177) and Bacharach (Dkt. No. 190) indicated they intended to withdraw their Objections). Of the remaining 14 objections, 10 appear to be from ordinary pet owners who are understandably upset about being mislead about the ingredients in the pet food, and who would have preferred a higher dollar amount for their claims, and/or would have preferred a lower attorneys' fee award, and/or who may wish for compensation for claims that are beyond the scope of the claims alleged in this litigation, but who don't make a showing that the settlement is in any way materially unfair to the class as a whole.[13] The remaining 4 objections were received from professional (a/k/a "serial" objectors), and/or an individual whose counsel makes a living representing serial objectors. These professional objectors habitually add nothing of value to the class members as a whole or the structure of the settlements they challenge, but who merely seek to gain recompense

---

[11]    Pursuant to the Preliminary Approval Order and the Notice, exclusions and objections were to be received by April 14, 2016.

[12]    On May 9, 2016, Counsel received one additional objection from Phyllis Hartzell, that was post-marked on May 3, 2016, over 2 weeks after the close of the objection deadline of April 14, 2016. Ms. Hartzell's objection states that she missed the deadline because she was unaware that the class action was in process, and she asserts that the amount of compensation is "unfair."

[13]    *See e.g.*, Albea Objection, Dkt. No. 185 (attaching photos of sick cat, and seeking recovery of vet bills).

for themselves by holding the settlement hostage while filing frivolous appeals.[14] Plaintiffs respond to these objections more fully in their Omnibus Response to Objectors Memorandum, to be filed separately.

The low objection and exclusion rate in this case supports settlement approval. In *Marshall*, for example, while 6 of the 23 class representatives objected to the settlement, suggesting that it "may not have been particularly favorable to what they believed *their particular* claims were worth," less than 10% of class members opted out, indicating that the settlement was favorable to most class members. *Marshall*, F.3d at 513 (emphasis original). As the Court explained, it has approved class-action settlements "even when almost half the class objected to it" and even "when all the named plaintiffs opposed it." *Id.* (citing *VanHorn*, 840 F.2d at 606 (180 of 400 inmates objecting). *See also Elliott v. Sperry Rand Corp.,* 680 F.2d 1225, 1226–27 (8th Cir.1982) (finding no abuse of discretion although both named plaintiffs objected and 790 of approximately 3,000 members objected). Furthermore, if individual class members are dissatisfied with the settlement, they may opt out. *Id.*[15]

Here, there has been wide dissemination of pertinent information about the Settlement, including through the Settlement Website, Notice by publication and direct Notice by email or postcard to all Blue Buffalo customers for whom Blue Buffalo possesses address information.

---

[14] "[P]rofessional objectors can levy what is effectively a tax on class action settlements, a tax that has no benefit to anyone other than to the objectors. Literally nothing is gained from the cost: Settlements are not restructured and the class, on whose benefit the appeal is purportedly raised, gains nothing." In re Checking Account Overdraft Litigation, 830 F.Supp.2d 1330, 1361, n. 30 (S.D.Fla.2011) (quotations omitted, brackets in orig.)."

[15] Several objectors complain that Blue Buffalo food may have resulted in adverse health effects to their pets. *See, e.g.*, Dkt. Nos. 176-178. Respectfully, while these complaints appear to be entirely sincere and made in earnest, they reflect individualized circumstances pertaining to particular health conditions, that simply were not at issue in the case. Each objector has the option to opt out if he or she believes the settlement is inadequate or insufficient to meet his/her particular circumstance.

Finegan Decl.¶¶22-41.[16]  All of the class representatives reviewed and approved the Stipulation

of Settlement prior its execution.[17] None of the class representatives objected.  Kravitz Decl. ¶24.

On December 18, 2015, the claims administrator on behalf of counsel for Defendants also

issued notices to governmental officials, including each of the fifty state attorneys general, as

required by the Class Action Fairness Act.  *See* Finegan Decl. ¶ 31; Dkt. No. 164 at 7; 28 U.S.C.

§ 1715.  No recipients of CAFA notice have objected, further favoring final approval.  Finegan

Decl. ¶ 31.

## II.    THE PROPOSED CLASS SHOULD BE CERTIFIED FOR SETTLEMENT

The requirements of Rule 23(a) are numerosity, commonality, typicality, and adequacy of

representation.  "Once those prerequisites have been met, the plaintiff must also establish that the

class fits within one of three types of class actions listed in Rule 23(b)."  *Avritt v. Reliastar Life

Ins. Co.*, 615F.3d 1023, 1029 (8th Cir. 2010).  Under Rule 23(b)(3), certification is appropriate if

"questions of law or fact common to class members predominate over any questions affecting

only individual members" and a class action "is superior to other available methods for fairly and

efficiently adjudicating the controversy."  *Id*. (internal citation omitted).  The Court need not

determine whether the action, if tried, would present intractable management problems, "for the

---

[16]     One objection from Mr. Duggan and Ms. Caminiti (husband and wife), suggests that retailers
themselves should have displayed notice of the Settlement at retail centers. *See* Dkt. No. 175 at ¶¶13-15.
The suit does not name retailers, who are not parties to the settlement agreement or its notice provisions.
And of course, there is no one "right way" to provide notice contemplated by Rule 23(e), which requires
only "the best notice practicable," *In re Wireless,* 2004 WL 3671053, at *8-9, in reasonable manner.
*Claxton*, 2015 WL 3648776, at *6. Here, notice was disseminated by multiple media including
individualized notice, that exceeded any required due process minimum.  These (and all the other)
objectors clearly did receive notice, permitting them to voice their complaints.

[17]     Some of the named representatives made Option 1 claims, and some named representatives made
Option 2 claims. Thus, all class members, regardless of whether or not they had proof of purchase, were
represented by at least one member of the Executive Committee. Kravitz Decl. ¶25-26. In addition, all
class members' claim amounts were calculated based on the same 10% premium for the value of the "no
chicken byproduct meal" representation. *See* Pakter Aff. at ¶13. The only variation between class
members was the maximum recovery based upon whether or not the class member had proof of purchase.

proposal is that there be no trial." *Amchem Prods. v. Windsor*, 521 U.S. 591, 620 (1997); s*ee also* Fed. R. Civ. P. 23 (b)(3)(D). The proposed Settlement Class meets all applicable requirements.

### A. The Requirements of Rule 23(a) Are Met.

#### 1. <u>Numerosity is satisfied.</u>

Numerosity here cannot reasonably be disputed. Blue Buffalo has identified over 1.9 million potential members of the Settlement Class. *See* Finegan Decl. ¶ 22. This far exceeds any threshold for numerosity.[18]

#### 2. <u>Commonality is satisfied.</u>

The proposed Settlement Class also meets the commonality requirement of Rule 23(a)(2), which requires that the issues raised have "the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011) (emphasis original). The threshold for commonality is low, requiring only that the issue "linking the class members is substantially related to the resolution of the litigation." *In re Zurn Pex*, 2013 WL716088, at *3 (internal citations and quotations omitted). That is, Plaintiffs' "claims must depend on a common contention . . . that it is capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 131 S. Ct. at 2551. "[T]he presence of differing legal inquiries and factual discrepancies will not preclude

---

[18] *See Knowlton v. Anheuser-Busch Companies, LLC*, 4:13-CV-210 SNLJ, 2014 WL 2009076, at *2 (E.D. Mo. May 16, 2014) (certifying class of "[s]ome 800 persons" because "[r]equiring each of those individuals to bring his or her own legal action undoubtedly would be inconvenient and costly to both individuals and the legal system."); *Jones v. NovaStar Fin., Inc.*, 257 F.R.D. 181, 186 (W.D. Mo. 2009) (class of over 1,000 satisfied numerosity); *Bradford v. AGCO Corp.*, 187 F.R.D. 600, 604 (W.D. Mo. 1999) (class of 20-25 members "sufficiently numerous under Rule 23."); *Glen v. Fairway Indep. Mortg. Corp.*, 265 F.R.D. 474, 478 (E.D. Mo. 2010) (numerosity met where "plaintiffs aver that there are at least 300 and probably 1,382 class members") (order clarified on unrelated grounds in No. 4:08CV730 RWS, 2010 WL 891621 (E.D. Mo. Mar. 8, 2010)); *Arkansas Educ. Ass'n v. Board of Educ.*, 446 F.2d 763, 765-66 (8th Cir. 1971) (20 class members sufficiently numerous).

class certification." *Glen v. Fairway Indep.Mortgage Corp.*, 265 F.R.D. 474,478 (E.D. Mo. 2010).

Commonality is easily satisfied here because Plaintiffs and all Settlement Class Members' claims arise from the same facts, focused on the common contention that Blue Buffalo's True Blue Promise assured customers that its products contained "NO Chicken or Poultry By-Product Meals," "NO Corn, Wheat, or Soy," and "NO Artificial Preservatives, Colors or Flavors." Plaintiffs' core allegation is that Blue Buffalo breached its True Blue Promise because "[s]cientific testing reveals that contrary to the True Blue Promise, the Blue Buffalo Products do, in fact, contain significant amounts of chicken/poultry by-product meal[,] [and] also contain corn, rice, grains, soy and/or artificial preservatives." Compl. at ¶9. Accordingly, commonality is met. *See e.g., Hartley v. Suburban Radiologic Consultants, Ltd.,* 295 F.R.D. 357, 376 (D. Minn. 2013) (commonality satisfied where claims based on form letters with same content to all class members); *Claxton*, 2015 WL 3648776, at *3 (common questions included "whether Defendant misrepresented the gasoline sold; whether the marketing/labeling of the gasoline was false, misleading, deceptive, or unfair;" and whether sale of contaminated fuel "constituted a breach of an express or implied warranty; etc.").

### 3.      Typicality is satisfied.

"Typicality requires the plaintiff to show 'the claims or defenses of the representative parties are typical of the claims or defenses of the class [.]'" *Claxton*, 2015 WL 3648776, at *3 (quoting Fed. R. Civ. P. 23(a)(3)). "The burden of demonstrating typicality is fairly easily met so long as other class members have claims similar to the named plaintiff." *DeBoer*, 64 F.3d at 1174. Typicality exists when there are "other members of the class who have the same or similar grievances as the plaintiff." *In re Zurn Pex*, 2013 WL 716088, at *3. Here, Plaintiffs' claims "emanate from the same legal theory or offense as the claims of the class," thereby satisfying

typicality.  *Doran v. Mo. Dep't of Soc. Servs.,* 251 F.R.D. 401, 405 (W.D. Mo. 2008).  All Class Members purchased Blue Buffalo Products, were exposed to the same True Blue Promise, and paid a price premium.  *See* Compl. & Am. Compl. at ¶¶17, 41-49.  *See Kelly v. Phiten USA, Inc.*, 277 F.R.D. 564, 568 (S.D. Iowa 2011) (typicality requirement was "clearly met" where each settlement class member's grievance was based upon the same alleged misleading statements by defendant).

### 4. <u>Adequacy is satisfied.</u>

Adequacy examines whether Plaintiffs and their attorneys "will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23 (a)(4).  "The adequacy requirement is met where "1) the representatives and their attorneys are able and willing to prosecute the action competently and vigorously; and 2) each representative's interests are sufficiently similar to those of the class that it is unlikely that their goals and viewpoints will diverge."  *Barfield v. Sho-Me Power Elec. Co-op.,* 2013 WL 3872181, at *3 (W.D. Mo. July 25, 2013) (quoting *Carpe v. Aquila, Inc.*, 224 F.R.D. 454, 458 (W.D. Mo. 2004)).

As described herein and in the Kravitz Decl., Class Counsel and Supporting Counsel are qualified and experienced in complex, class action litigation. Kravitz Decl. ¶5; Dkt. Nos. 11, and 11-1 through 11-5.  *See White v. Martin*, 2002 WL 32596017, at *10 (W.D. Mo. Oct. 3, 2002) ("In the absence of proof to the contrary, courts presume that class counsel is competent and sufficiently experienced to vigorously prosecute the class action.") (quoting *Morgan v. United Parcel Serv. of Am., Inc.*, 169 F.R.D. 349, 357 (E.D. Mo. 1996)).  In addition, Plaintiffs' interests are aligned with the interests of the Class.  Plaintiffs have pursued and obtained a settlement that is fair and adequately compensates Class Members.

**B. The Requirements of Rule 23(b)(3) Are Met.**

Finally, the proposed Settlement Class meets Rule 23(b)(3), which authorizes certification where "questions of law or fact common to class members predominate over any questions affecting only individual members;" and "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." *Claxton*, 2015 WL 3648776, at *4; Fed. R. Civ. P. 23(b)(3). "When a class is being certified for settlement, the Court need only analyze the predominance of common questions of law and the superiority of class action for fairly and effectively resolving the controversy; it need not examine Rule 23(b)(3)(A-D) manageability issues, because it will not be managing a class action trial. " *See* I*n re Zurn Pex Plumbing Products Liab. Litig*., 08-MDL-1958 ADM/AJB, 2013 WL 716088, at *5 (D. Minn. Feb. 27, 2013) *(citing Amchem*, 521 U.S. at 620). Both aspects of Rule 23(b)(3) are met here.

**1. Predominance is satisfied.**

Predominance requires "a showing that questions common to the class predominate, not that those questions will be answered, on the merits, in favor of the class." *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1191 (2013). "The fact that some individual questions will be involved in the case does not preclude a finding that the common issues will predominate." *Carpe*, 224 F.R.D. at 458; *see also Clark v. Bally's Park Place, Inc.*, 298 F.R.D. 188, 199 (D.N.J. 2014) ("All class members need not be identically situated upon all issues, so long as their claims are not in conflict with each other.") (internal quotations and citation omitted). This is "a test readily met in certain cases alleging consumer or securities fraud." *Amchem*, 521 U.S. at 625.

Plaintiffs' and Class Members' claims all arise from the uniform True Blue Promise, and the question of whether Defendant made misrepresentations concerning the True Blue Promise predominates across the class. *See supra* § II.A.2. The elements of each claim can be

established with common evidence regarding Blue Buffalo's uniform conduct and representations, including for example, its admission that the Products did contain chicken by-product meal in violation of the True Blue Promise. *See* Compl. at ¶13.[19] Because the overriding questions focus on Defendant's conduct—not Plaintiffs' conduct—and because they concern the core question of liability, they predominate over any individualized questions. *See Jones v. CBE Grp., Inc.*, 215 F.R.D. 558, 569 (D. Minn. 2003) ("The predominance inquiry focuses primarily on common questions regarding liability.").[20]

## 2. Superiority is satisfied.

Resolution through a class-wide settlement and claims process is the superior way to proceed. Settlement of the class will avoid duplicative litigation, saving resources and legal costs. In addition, the settlement provides a substantial remedy to legions of class members who might otherwise be precluded from obtaining a recovery based on the relatively small individual economic injuries involved. *Claxton*, 2015 WL 3648776, at *5 (A class action "avoid[s] potential duplicative litigation and . . . save[s] the parties time and legal costs to adjudicate common legal and factual issues," and thus, is superior to other available methods for fairly and efficiently adjudicating the controversy."). In addition, those Class Members that feel they are entitled to additional relief can choose to opt out. *Marshall*, 787 F.3d at 513; *In re Zurn Pex Plumbing Products Liab. Litig.*, 2013 WL 716088, at *5 ("Because this is an opt-out settlement, those who wish to pursue their own claims are free to do so.").

---

[19]     Any differences in state laws does not defeat predominance when certifying a settlement class, which removes manageability issues from the equation. *Sullivan v. DB Investments, Inc.*, 667 F.3d 273, 302-03 (3d Cir. 2011); *accord In re Am. Int'l Grp., Inc. Sec. Litig.*, 689 F.3d 229, 241 (2d Cir. 2012).

[20]     *Accord In re McDonnell Douglas Corp. Sec. Litig.*, 98 F.R.D. 613, 616 (E.D. Mo. 1982) ("[I]n determining whether common questions predominate, courts focus on the liability issues"); *Janson v. LegalZoom.com, Inc.*, 271 F.R.D. 506, 512 (W.D. Mo. 2010) (common evidence not "dependent on the conduct of [Defendant's] customers, but rather the conduct of [Defendant] itself."); *Jackson v. Collections Acquisition Co., LLC*, 2013 WL 5592603, at *4 (E.D. Mo. Oct. 9, 2013) ("[c]ommon questions of fact predominate because the primary issue in this case involves the legality of defendant's conduct").

To Plaintiffs' knowledge, only a single individual potential Settlement Class member has chosen to commence litigation separate and apart from the class litigation, further suggesting that collective action is superior.[21] The Judicial Panel on Multidistrict Litigation already has determined that this Court is an appropriate forum in which to concentrate class members' claims. Thus, resolution of all claims, which arise from a common course of conduct, through a class-wide settlement is a practical and proper course of action.

## CONCLUSION

For all these reasons, Plaintiffs request that the Court: (1) enter the Final Order and Judgment attached hereto, (2) approve the proposed class action settlement as fair, reasonable, and adequate, (3) certify a Rule 23(b)(3) class for settlement purposes only, (4) approve Incentive Awards to the named representatives in the amount of $1500 each, and (5) Overrule the Objections. Plaintiffs further request all such other relief as the Court deems necessary and appropriate.[22]

Dated: May 12, 2106                     Respectfully Submitted,

                                         _/s/ Scott A. Kamber_____
                                        Scott A. Kamber (SK-5794,SDNY)
                                        KamberLaw LLC
                                        100 Wall Street 23rd floor
                                        New York, NY 10005
                                        P. (212) 920-3072
                                        F. (212) 202-6364
                                        skamber@kamberlaw.com

---

[21] One opt-out, Kevin Stethem, filed an action against Blue Buffalo in small claims court in Washington State. Having submitted proof of purchase for $1125.51 in that action, Mr. Stethem only received a Judgment in the amount of $549.20 (including court costs). Had Mr. Stethem remained in the class and filed a claim, he would have done much better. In fact, he likely would have received the full amount of his $1125.51 in claimed purchases. *See* Kravitz Decl. at ¶¶35-36.

[22] The proposed order regarding attorneys fees is addressed separately in the Application for Attorneys Fees and Costs.

Deborah Kravitz, #275661CA
KamberLaw LLP
401 Center St., Suite 111
Healdsburg, CA
P. (707) 820-4247
F. (212) 202-6364
dkravitz@kamberlaw.com
    *Class Counsel, Settlement Counsel, and Chair of*
    *the Plaintiffs' Executive Committee*

The Simon Law Firm, P.C.
John G. Simon, #35231MO
800 Market Street, 17th FL
St. Louis, Missouri 63101
P. (314) 241-2929
F. (314) 241-2029
jsimon@simonlawpc.com
    *Liaison Counsel and Member Plaintiffs' Executive*
    *Committee*

Gray, Ritter & Graham, P.C.
Don M. Downing #30405MO
701 Market Street, Suite 800
St. Louis, MO 63101-1826
P. (314) 241-5620, ext. 2006
F. (314) 241-4140
ddowning@grgpc.com

Bursor & Fisher, P.A.
Joseph I. Marchese
Frederick J. Klorczyk, III
888 Seventh Ave.
New York, NY 10019
P. 646-837-7410
F. 212-989-9163
jmarchese@bursor.com
fklorczyk@bursor.com

Steelman, Gaunt & Horsefield
David Steelman, #27334MO
901 N Pine St
Rolla, MO 6540
P. (573) 341-8336
F. (573) 341.8548
dsteelman@steelmanandgaunt.com

    *Members of Plaintiffs' Executive Committee*

## CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that on May 12, 2016 the foregoing was

filed electronically with the Clerk of Court to be served by operation of the Court's electronic

filing system upon all counsel of record.

By: _/s/ Deborah Kravitz _____
Counsel for Plaintiffs