# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF MISSOURI

| | |
|---|---|
| IN RE BLUE BUFFALO COMPANY, LTD. MARKETING AND SALES PRACTICES LITIGATION<br><br>RELATES TO: ALL CASES | Case No. 14-md-02562-RWS<br><br>**DECLARATION OF SCOTT A. KAMBER IN SUPPORT OF PLAINTIFFS' APPLICATION FOR ATTORNEYS FEES AND EXPENSES** |

## DECLARATION OF SCOTT A. KAMBER

I, Scott A. Kamber, declare as follows:

1.      I am an attorney licensed to practice before all courts of the State of New York, have been admitted to practice before this court *pro hac vice*, and am Managing Partner of the law firm of KamberLaw LLC and KamberLaw, LLP (collectively "KamberLaw").  I serve as Class Counsel, Settlement Counsel, and Chair of the Executive Committee of Plaintiffs' counsel in the above-captioned litigation, and make this declaration in support of Plaintiffs' Application for Attorneys Fees.

2.      As Class Counsel and Settlement Counsel, I am the attorney that is primarily responsible for representing Plaintiffs in this action.  However, in addition to the support of highly experienced counsel at KamberLaw, including Deborah Kravitz, the matter was also ably prosecuted by a team of highly esteemed members of the Executive Committee, which included John Simon, The Simon Law Firm, P.C., as Liaison Counsel, Don M. Downing, Gray, Ritter & Graham, P.C., David Steelman, Steelman, Gaunt & Horsefield, and Joseph I. Marchese, Bursor & Fisher, P.A. (collectively, the "Executive Committee" or "Leadership").  The firm resumes and qualifications of each of these firms and individuals were presented to the Court on November 6, 2014, as part of the Motion for Appointment of Interim Lead Counsel, Dkt. 11,

Declaration of Scott A. Kamber in Support of
Plaintiffs' Application for Attorneys Fees
P a g e | 1

Exs. 1-5.

3.      I have actively participated in all aspects of this litigation, including the negotiation of the settlement, and am fully familiar with the proceedings in the matter in which the parties seek resolution.  If called upon, I am competent to testify that the following facts are true and correct based upon my personal knowledge.  It was the responsibility of my Firm and me to ensure that the litigation was conducted efficiently and to minimize duplication of efforts. *See* Order Appointing Interim Class Counsel, Liaison Counsel, and Plaintiffs' Executive Committee, Dkt. No. 35, at ¶¶ 3(h) and 5; The Manual for Complex Litigation (4th ed. 2004) at ¶40.22(1.d) (Sample Order).  I also sought to involve members of the Executive Committee in ways that would ensure that, if the case went to trial, the attorneys who would actively participate with Class Counsel at trial, Mr. Downing, Mr. Steelman and Mr. Simon, would be involved in the strategy decisions that would impact their ability to successfully try the case.

THE SUBSTANTIVE WORK REQUIRED TO SUCCESSFULLY LITIGATE THIS MATTER

4.      From the inception of this litigation, Plaintiffs' counsel has aggressively prosecuted this case and vigorously represented the best interests of the Plaintiffs and Class Members.  KamberLaw, with the support of the Executive Committee, has taken the lead in the prosecution of the litigation, including investigating the facts, independently testing the Blue Buffalo products at issue, participating in all 11 hearings and conferences, coordinating all activities amongst Plaintiffs' counsel, reviewing and analyzing documents, assembling and drafting pleadings, conducting legal research and discovery, and communicating with counsel for Blue Buffalo and third-parties.

Early Investigation and Work Regarding Consolidation and Appointment of Counsel

5.      The origins of the case date to May 6, 2014, when Nestle Purina filed an antitrust

action against Blue Buffalo (the "Purina Lanham Act" action).  While information gleaned from the Purina Lanham Act case was certainly helpful to the prosecution of this matter, I, along with the Leadership, undertook our own independent investigation of the facts and pursued an independent litigation agenda commensurate with our fiduciary duties to Plaintiffs and Class Members.

6.     Shortly thereafter, consumers in several states filed a series of class actions (challenging the veracity of certain claims made by Blue Buffalo Company, Ltd. ("Blue Buffalo") regarding the ingredients in its pet foods.  In addition to the ordinary factual inquiry that precedes the initiation of such a case, Plaintiffs' counsel here also engaged in substantial additional investigation, which included laboratory testing of Blue Buffalo Products, with respect to a variety of the ingredient claims made by Defendant.  Independent testing of the Blue Buffalo products initially took place before the JPML proceedings described below.  More extensive testing took place subsequently as part of Class Counsel's investigation. *See infra* at ¶21.

7.     On June 16, 2014, Blue Buffalo filed its initial Motion to Transfer before the Judicial Panel on Multidistrict Litigation ("JPML").  In the wake of that filing, Class Counsel (as well as several members of the eventual Executive Committee) filed a Notice of Appearance before the JPML.  In addition, Class Counsel drafted and filed a substantive Response in Opposition to Blue Buffalo's Motion, wherein Class Counsel argued that the panel should both coordinate the class actions with the pending Purina Lanham Act case (a position that was not advanced by Blue Buffalo), and that it should transfer the consolidated and coordinated actions to the Eastern District of Missouri.

8.     The JPML set a hearing on the Blue Buffalo MDL for October 2, 2014 in Louisville, KY.  Class Counsel duly filed a Notice of Presentation of Oral Argument, and

traveled to Louisville to present argument.  I was chosen by Plaintiffs' counsel in attendance to argue for the Plaintiffs, advocating for the MDL to be consolidated in the Eastern District of Missouri.  Ultimately, Class Counsel prevailed in its arguments to both coordinate the Purina Lanham Act case with the class actions, and to have the consolidated and coordinated actions transferred to this district: on October 17, 2014, the JPML entered a Transfer Order that centralized these actions against Blue Buffalo in this Court.  *See* Dkt. No. 1.  As detailed below, I have excluded from this Application all of the hours and expenses expended in the MDL process.

9.      This Court entered the Order Upon Transfer on October 31, 2014 (Dkt. No. 5), which initiated a process of various Plaintiffs' counsel attempting to self organize to manage litigation of the class actions.  I entered my appearance on November 6, 2014 (Dkt. No. 9) and played an active role in trying to reach consensus with other counsel to create a structure that would efficiently and effectively represent class members.  Consensus was unable to be reached, which necessitated a vigorous round of motion practice (*see* Dkt. Nos. 11, 13, 19, 23, and 25). As detailed below, I have excluded from this Application all of the hours and expenses expended in the selection of Interim Class Counsel.

10.      While that process was still ongoing, the Court entered a further Order on November 14, 2014 setting an Initial Case Conference for December 15, 2014.  In accordance with the Court's Order, my firm and I worked with other Plaintiffs' counsel to reach consensus on and file a statement of the case and a proposed agenda for the December 15, 2014 conference. Dkt. No. 27.

11.      On December 15, 2014, the Court held a status conference and heard argument on the motions for lead counsel.  Subsequently, on December 16, 2014, the Court entered an Order directing that counsel for Plaintiffs confer and seek consensus on candidates for lead counsel,

liaison counsel, and an executive committee.  The Court also set a Rule 16 conference for February 24, and directed the parties to develop a Joint Scheduling Plan.  Dkt. No. 31.

12.     Between December 16 and December 22, 2014, my firm and I redoubled our efforts to seek consensus on a leadership structure in accordance with the Court's Order, and filed a report regarding the same on December 22, 2014.  Dkt. No. 34.  Those efforts ultimately resulted in the current leadership structure, memorialized by the Court in its Order Appointing Interim Class Counsel, Liaison Counsel and Plaintiffs' Executive Committee on December 23, 2014 (Dkt. No. 35), that has managed the case through the present.

Drafting of Consolidated Complaint and Discovery Plan

13.     Under my direction, Leadership immediately set to work on preparing the Consolidated Complaint.  My firm and I delegated portions of the research, further investigation, and drafting of the consolidated complaint, and supervised and participated in all aspects of that effort, including the vetting and evaluation of potential named class representatives.  As part of the process, counsel engaged in an extensive analysis of consumer protection statutes, and express and implied warranty claims under the laws of all 50 states, as well as research concerning the applicability of Magnuson-Moss Warranty Act claims, and common-law unjust enrichment claims.  Further, Leadership, with the assistance of other supporting Plaintiffs' counsel, engaged in detailed discussions with putative class members, including those class members ultimately selected as class representatives.

14.     On January 30, 2015, Plaintiffs filed their Consolidated Class Action Complaint asserting claims against Blue Buffalo under the Magnuson-Moss Warranty Act, Missouri Merchandising Practices Act, New York General Business Law § 349 (New York Deceptive Trade Practices Act), New York General Business Law § 350 (New York False Advertising

Law), California Civil Code § 1750 *et seq.* (Consumers Legal Remedies Act or "CLRA"), California Business and Professions Code § 17200 *et seq.* (Unfair Competition Law or "UCL"), California Business and Professions Code § 17500 *et seq.* (False Advertising Law or "FAL"), New Jersey Consumer Fraud Act, New Jersey Truth-In-Consumer Contract, Warranty and Notice Act, Illinois Unfair Practices Act, Florida's Deceptive and Unfair Trade Practices Act, Ohio Consumer Sales Practices Act, and for Breach of Express Warranty, Breach of Implied Warranty of Merchantability, and Unjust Enrichment.

15.     With the Consolidated Complaint filed, my firm and I focused on developing a plan for prosecuting the case to a successful conclusion.  My firm and I, with the advice and assistance of the Executive Committee, worked diligently to develop an aggressive Rule 16 plan to efficiently and expeditiously move the case forward.  To that end, my firm and I engaged in detailed and lengthy negotiations with Defendant's counsel on a joint Rule 16 discovery plan. The parties had numerous calls to meet and confer on a joint plan, and exchanged multiple draft plans.  The Joint Scheduling Plan was filed by the Parties on February 17, 2015.  Dkt. No. 37. Notably, through the substantial efforts of counsel, the parties were able to reach consensus on all facets of the discovery plan.

16.     I appeared in person for the Rule 16 Conference on February 24, 2015. Immediately following the conference, the Court entered a Case Management Order setting a schedule for the matter (Dkt. No. 41), and initiating the discovery phase of the litigation.

Discovery Work

17.     Shortly thereafter, Leadership set to work on collecting information from the named representatives and drafting Initial Disclosures.  This effort was shared by all of the firms who had retained clients selected to serve as representative plaintiffs.  I, along with members of

my firm, coordinated all assignments.   Initial disclosures were exchanged on March 10, 2015.

18.     My firm and I then began informal discovery efforts to collect information already developed in connection with the coordinated Purina Lanham Act case, entered into an intense phase of negotiation over an appropriate Protective Order, and began drafting formal discovery.   The collection and review of the Purina Lanham Act case materials was intensive, including in person meetings and review of filings and produced materials.   The objective in obtaining and reviewing that material was two-fold: (1) to gain an understanding of what had been developed in that action so not to duplicate efforts; and (2) to independently evaluate the materials as fiduciary for the Class.   As Class Counsel I always understood that the goals and motivations of Purina were not necessarily fully aligned with the interests of the Class Members, who were consumers of Blue Buffalo products.

19.     After much negotiation, a Protective Order was submitted on April 9, 2015 (Dkt. No. 46), and so Ordered by the Court on April 10, 2015.   Dkt. No. 47.   Following later developments in the case, Class Counsel initiated an effort to amend the Protective Order.   Such amendment was negotiated with the parties in this action, as well as the parties to the Purina Lanham Act case, and submitted to the Court on June 23, 2015 (Dkt. No. 70).   The Amended Protective Order was an important development because it would allow Class Plaintiffs in this action to obtain discovery produced by all parties in the Purina Lanham Act case.   The Court so Ordered the Amended Protective Order on June 24, 2015.   Dkt. No. 71.

20.     In summary, the discovery phase of the litigation, which spanned March 2015 through mid-December 2015 (although at a considerably slower pace after mediation, which included discovery from third parties that was not received until after the initial mediation) accounted for the great majority of time and expense incurred in this litigation.   It included the

exchange of information between the parties through formal discovery processes, including written discovery; meeting and conferences between representatives of the parties; interviews of numerous potential witnesses; retention of an expert; service of third-party subpoenas (which entailed substantial follow-up and negotiation); obtaining and reviewing key transcripts of depositions taken in the *Purina* matter; noticing and preparing for numerous depositions; and negotiating a sophisticated ESI protocol.  See Dkt. No. 54.  In addition, more than 157,000 documents were reviewed and coded, many of which were highly technical.  The document coding process was managed and supervised by my firm and me, as well as several members of the Executive Committee.  While the great majority of the coding was performed by my firm, document reviewers were also provided by several firms, including Gray Ritter and Graham, the Simon Firm, and Steelman Gaunt and Horsefield,.  All reviewers had common training on the elements of the case required for the coding, and were supervised to ensure consistent results of the review.  In all, approximately 20 reviewers worked to complete the document review.  This entire process was completed in a manner to ensure that the reviewed documents were useable for litigation purposes, including class certification and trial, as well as to provide the information necessary to maximize leverage at mediation and/or confirm elements of the settlement prior to its submission for approval to the Court.

21.     During the discovery process, Leadership commissioned independent testing of certain of Blue Buffalo's Products to verify the allegations of the complaint and test representations made by Blue Buffalo regarding the extent of the issues with the True Blue Promise.  I personally directed these efforts, including the interview of experts, visiting the testing facility, meeting with expert and laboratory personnel on testing protocols and,

ultimately, compilation of the results of the testing.[1]  In addition, my firm and I were responsible for efforts addressing the tracing of product purchases and the ultimate identification of products that may have contained ingredients that violated the True Blue Promise.

22.    In total, the discovery phase of the litigation accounted for 72 percent of my firm's time in the litigation (2,569 out of 3,572 hours) and 63 percent of the time expended by Leadership as a whole.  My firm and I directly assigned all discovery related tasks to ensure there was no duplication of efforts.  Further, we assigned work to firms who committed to having substantive review and coding work assigned to attorneys with a minimum of three years' experience, and then normalized all document reviewer billing rates at $300.  We also traced the efficiency of reviewers, a process that resulted in the review of over 157,000 documents in 4147 hours, yielding a review and coding rate of 38 documents per hour.  The information from these documents was utilized in the selection of products to be tested, the process of tracing raw materials across products, confirming representations made by Blue Buffalo during the settlement process, selection of witnesses, preparing deposition materials and preparing class certification papers.  We also used advanced analytic tools to examine the documents for patterns, which assisted the review process and helped us ensure that all responsive documents were produced.  This case could not have been successfully litigated past class certification without the discovery and document review process.

Court Appearances and Third-Party Litigation

23.    In addition to the court conferences referenced above, my firm prepared agenda for and I attended status conferences set by the Court on April 21, 2015 (Dkt. No. 48), May 19, 2015 (Dkt. No. 57), June 15, 2015 (Dkt. No. 62), July 23, 2015 (Dkt. No. 100), August 20, 2015

---

[1] This expert was hired as a consulting expert and not as a testifying expert.

(Dkt. No. 122), and September 24, 2015 (Dkt. No. 139).  To date, I have made 11 appearances before this Court on this Matter.  I also attended the May 8, 2015 hearing in the *Purina v. Blue Buffalo* matter that I believed would be particularly relevant to the litigation of this case.  I did not bill my expenses related to my attendance at that hearing.

24.     As a result of extensive third-party practice that developed over the course of the litigation (with numerous counter and cross-claims being filed by and against parties newly added to the case) it became necessary to amend the schedule in the case.  Class Counsel had to diligently endeavor to keep the class action portion of the case moving forward while the other parties sought to build additional time into the schedule to accommodate the extensive third-party motion practice in which they were engaged.   As a result, Class Counsel negotiated amendments to the schedule with all the parties that had entered case, resulting in Amended Case Management Orders being entered by the Court on June 15, 2015 (Dkt. No. 64) and August 20, 2015.  Dkt. No. 124.

25.     During this time period, Leadership also attended to issues relating to tag-along actions that were filed (*see* e.g. Dkt. Nos. 125 and 150), and monitored both the third-party litigation underway in this action, as well as continuing to monitor developments in the Purina Lanham Act case.

26.     Leadership, under the direction of my firm and me, was far along in preparing a motion for class certification, in anticipation of making such motion in December 2015.  I believe this effort was critical not only for the success of the litigation, but also for maximizing leverage at the mediation.   The success of the mediation would in many ways depend on Plaintiffs being ready, willing and able to move for class certification in a timely manner if the mediation was not successful.  It was critical that we entered the mediation in a frame of mind

where obtaining the best possible relief for the Class settlement was a choice, and not a necessity.

Settlement Negotiations

27.     Beginning in October 2015, Defense counsel and I participated in a series of settlement discussions, by phone and in-person in the context of a private and confidential mediation before Judge Andersen (Ret.) in Chicago, Illinois, which entailed substantive, arms-length negotiations.  This process involved: the review of the substantive facts developed; a comprehensive understanding of Eighth Circuit settlement standards; and input and interaction with the Class Representatives regarding the terms of the settlement.  There was also a constant dialogue among Leadership to ensure that a settlement would only be accepted if it was in the best interest of Class Members, was worthy of the approval of this Court and the Eighth Circuit, and would likely would be met with enthusiasm by the named Representative Plaintiffs and Class Members. The efforts of Gray, Ritter & Graham were instrumental in developing the relevant legal standards and working with Class Counsel to ensure that the Settlement complied with all aspects of Eighth Circuit law.

28.     During an in-person mediation on October 26, 2015, the parties candidly expressed the strengths and weaknesses of their positions in a full and professional process spearheaded by (Ret.) Judge Andersen.  Although an agreement was not reached on the first day of mediation, the parties, with the continued assistance of Judge Andersen, were able to negotiate a Settlement that provides meaningful cash compensation to Settlement Class Members, as well as injunctive relief, and avoid the risks and delay of further litigation.  I believe that the substantive work accomplished by Leadership and its collective trial experience created a credible threat of success in ongoing litigation, which was critical in obtaining a settlement of the

quality of the one presented.

29.     After the mediation in late October, the parties negotiated with one another to flesh out the settlement framework and details of its proposed implementation.  The parties continued to negotiate, exchange information regarding settlement details, examine approaches to potential injunctive relief, and sought the continued assistance of the mediator.  This process included detailed negotiations of every aspect of the notice program, as there was great tension between the needs of Class Counsel to present a notice program that satisfied all due process requirements and ensured the best practicable notice to the Class, and the desire of Blue Buffalo for the notice program to be sensitive to its brand integrity.

30.     Ultimately, as a result of those protracted efforts, the Parties entered into a Settlement Agreement that called for Blue Buffalo to pay $32 million into a settlement fund for compensation to Settlement Class Members as monetary benefits.  The Stipulation of Settlement and all supporting papers were submitted to the Court as part of the Motion for Preliminary Approval of Class Settlement, Certification of Settlement Class, Permission to Disseminate Class Notice, and Leave to File a First Amended Consolidated Complaint.  Dkt. Nos. 158-160.

31.     In addition, there was substantive discussion and negotiation regarding injunctive relief.  Injunctive relief was material to Plaintiffs because it was important that the settlement include provisions that would help prevent this type of misrepresentation from happening again. With that in mind, negotiations with defense counsel regarding injunctive relief resulted in the Settlement Agreement providing that Blue Buffalo will no longer represent to the public that the Blue Buffalo Products do not include chicken or poultry by-product meal unless or until: (a) all specifications for Blue Buffalo Products have been reviewed to ensure that they are consistent with all packaging claims found on the product and representations regarding the products found

on the Blue Buffalo website; and (b) Blue Buffalo has reviewed its supplier relationships and has instituted practices to ensure that all materials provided by its suppliers comply with the applicable product specifications.

32.     The settlement process was overseen by (Ret.) Judge Andersen.  All discussions regarding all substantive aspects of settlement, incentive fees, and Plaintiffs' counsel fees were done through the participation of Judge Anderson (either telephonically or in person).  At no point prior to reaching agreement on the substantive terms of settlement did the parties discuss the amount of any incentive fees to representative Plaintiffs or payments to Plaintiffs' counsel.

33.     The parties selected Heffler Claims Group ("HCG"), a qualified and reputable third-party administrator, to issue Notice to Class Members, receive exclusion requests, process claims, respond to inquiries, issue settlement checks to claimants, and conduct other activities relating to class notice and administration.   This Court approved the selection of HCG as Settlement Administrator as part of the Preliminary Approval process.  My firm and I have been actively involved in supervising and managing HCG, and its administration of the notice program and the claims process.  This has entailed: reviewing claims reports on a weekly basis; analyzing reports on impressions and other metrics regarding the success of notice; discussions regarding any improvements that could be made to the notice program and claim stimulation program; and monitoring the operations of the Interactive Voice Response (toll-free call center) process and class member communications to ensure that any issues with the notice or claims process were remedied promptly.  These efforts have been by telephone, by email and in person.

THE TIME AND EXPENSE EXPENDED BY LEADERSHIP

34.     To date, Class Counsel and the Executive Committee have prosecuted this action on a wholly contingent basis since commencing the litigation in May 2014.  During the past

twenty-four months, Leadership has advanced significant time and expense on behalf of the Plaintiffs and the Class.  In doing so, Class Counsel has long borne the risk of an unfavorable result.  Neither Class Counsel nor the members of the Executive Committee have been paid for their extensive efforts, or been reimbursed for costs incurred.  The efforts required in this matter required my firm, and upon information and belief, each of the other firms in Leadership, to forego other opportunities in order to fulfill their responsibilities in this matter.  In connection with Final Approval, Class Counsel now seeks an award of attorneys' fees.

35.     Class Counsel applies for a fee and expense award of $8,000,000.  This amount represents 25% of the total $32 million value of the Settlement Fund, exclusive of interest accumulated, and was the amount set forth in the Notice.

36.     I believe that this fee award is reasonable in relation to the substantial results achieved for the Settlement Class Members and the efforts of counsel.  Further, such an award is supported by the benchmarks for fee awards, costs and expenses in this District and the Eighth Circuit.

37.     Throughout the mediation and negotiation efforts, and in advising our clients of the proposed settlement, my firm and I have at all times considered the fairness, reasonableness and adequacy of the settlement for the Class, taking into account: the strength of Plaintiffs' case; the risk, expense complexity and likely duration of any further litigation; the risk of certifying a class and then maintaining class action status through trial; the amount offered in settlement; and the experience and views of Plaintiffs' counsel.  Against the backdrop of counsel's collective experience in prosecuting complex class actions, we have considered the claims set forth in the Complaint and our continued confidence in the merit of those claims, the scope of relief offered in the settlement compared to the potential relief at the conclusion of litigation, and the risks and

costs of continued litigation.  Taking these factors into account, it is my opinion that the proposed settlement is fair, reasonable and adequate, well within the range of possible approval, and therefore deserving of the Court's Final Approval.

38.     KamberLaw and the other member firms of the Executive Committee have diligently investigated and prosecuted this matter, dedicating substantial time, effort, resources, and expertise to the investigation of the claims at issue in the action, and have successfully negotiated the settlement of this matter to the benefit of the Class.  The qualifications of Class Counsel and the Executive Committee and their extensive experience in prosecuting complex class actions and other complex litigation, including firm resumes, were submitted to the Court prior to its appointment of Interim Lead Counsel, and are incorporated here by reference.  *See* Dkt. No. 11.

39.     Throughout this litigation I have had regular communications with members of the Executive Committee regarding their expenditure of time and expense.  Further, I, along with my colleague Deborah Kravitz, assigned all work in the case (usually through team calls and emails), and continuously monitored the work being performed by the other firms in Leadership in order to ensure consistent quality, that each firm was able to contribute constructively, and that there was no unnecessary duplication of efforts.

40.     In preparing the fee application and this declaration, I asked each member of the Executive Committee to provide me with a final reporting of the total hours and expenses expended by their respective firms.  In addition, I asked that each complete a grid that would show how many hours their firms spent on each phase of litigation.  This was done so as to provide this Court sufficient information to ensure that there was no duplication of effort and that a reasonable amount of time was expended during each phase of the litigation, in a form that did

not have to be provided *in camera*.  I have been informed by each member of the Executive Committee that, if asked, they would provide a declaration or confirm under oath that the time and expenses summarized in the grid accurately reflects the contemporaneous time and expense records of their respective firms.

41.     Based on my knowledge and experience, the hourly rates charged by Leadership are within the range of market rates charged by attorneys of equivalent experience, skill, and expertise.  Each Firm has confirmed to me that the rates charged here are the same hourly rates that are actually charged to regular hourly clients, if any, who have retained the firms for non-contingent matters, and which are actually paid by those clients.  Each firm has confirmed that, as a matter of firm policy, they do not discount regular hourly rates for non-contingent hourly work.  I have personal knowledge of the range of hourly rates typically charged by counsel in our field in New York, California, and throughout the United States, both on a current basis and in the past.  In determining my firm's hourly rates from year to year, I have consciously taken market rates into account and have deliberately tended to target my firm's rates to be somewhat below the rates charged in the market.  One reason I do that is because of the frequency that I litigate outside of the New York and California markets.

42.     Through my practice, I have become familiar with the non-contingent market rates charged by attorneys in New York, California and elsewhere (my firm's offices are in New York City and California).  This familiarity has been obtained in several ways:  (a) by litigating attorneys' fee applications;  (b) by discussing fees with other attorneys; (c) by obtaining declarations regarding prevailing market rates filed by other attorneys seeking fees; and (d) by reviewing attorneys' fee applications and awards in other cases, as well as surveys and articles on attorneys' fees in the legal newspapers and treatises.  The information I have gathered shows

that my firm's rates are in line with the non-contingent market rates charged by attorneys of reasonably comparable experience, skill, and reputation for reasonably comparable class action work.   In fact, comparable hourly rates have been found reasonable by various courts for reasonably comparable services, including:

a. *In re TFT-LCD (Flat Panel) Antitrust Litigation* (N.D. Cal. 2013) No. M 07 1827 SI, MDL, No. 1827, an antitrust class action, in which the court found blended hourly rates of $1000, $950, $861, $825, $820, and $750 per hour reasonable for the lead class counsel.

b. *Williams v. H&R Block Enterprises, Inc.* Alameda County Superior Ct. No. RG08366506, Order of Final Approval and Judgment filed November 8, 2012, a wage and hour class action, in which the court found the hourly rates of $785, $775, and $750 reasonable for the more senior class counsel.

c. *Luquetta v. The Regents of the Univ. of California,* San Francisco Superior Ct. No.CGC-05-443007, Order Granting Plaintiff's Motion for Common Fund Attorneys' Fees and Expenses, filed October 31, 2012, a class action to recover tuition overcharges, in which the court found the hourly rates of $850, 785, and 750, and 700 reasonable for plaintiffs' more experienced counsel.

d. *Pierce v. County of Orange* (C.D. Cal. 2012) 905 F.Supp.2d 1017, a civil rights class action brought by pre-trial detainees, in which the court approved a lodestar-based, *inter alia,* on 2011 rates of $850 and $825 per hour.

e. *Holloway et. al. v. Best Buy Co., Inc.* (N.D. Cal. 2011) No. 05-5056 PJH (Order dated November 9, 2011), a class action alleging that Best Buy discriminated against female, African American and Latino employees by

denying them promotions and lucrative sales positions, in which the court approved lodestar-based rates of up to $825 per hour.

f.  *Californians for Disability Rights, Inc., et al. v. California Department of Transportation, et al.* (N.D. Cal. 2010) 2010 U.S. Dist. LEXIS 141030, adopted by Order Accepting Report and Recommendation filed February 2, 2011, a class action in which the court found reasonable 2010 hourly rates of up to $835 per hour.

g.  *Credit/Debit Card Tying Cases,* San Francisco County Superior Court, JCCP No. 4335, Order Granting Plaintiffs' Motion for Attorneys' Fees, Expenses, and Incentive Awards, filed August 23, 2010, an antitrust class action, in which the court, before applying a 2.0 lodestar multiplier, found reasonable 2010 hourly rates of $975 for a 43-year attorney, $950 for a 46-year attorney, $850 for 32 and 38 year attorneys, $825 for a 35-year attorney, $740 for a 26-year attorney, $610 for a 13-year attorney, $600 for a 9-year attorney, and $485 for a 5-year attorney.

h.  *Qualcomm, Inc. v. Broadcom, Inc.* Case No. 05-CV-1958-B, 2008 WL 2705161 (S.D. Cal. 2008), in which the court found the 2007 hourly rates requested by Wilmer Cutler, Pickering, Hale & Dorr LLP reasonable; those rates ranged from $45 to $300 for staff and paralegals, from $275 to $505 for associates and counsel, and from $435 to $850 for partners.

43.   For work performed by firms that were not part of Leadership, I only sought time records in this case for work specifically assigned by Class Counsel.  While many firms filed complaints and incurred filing fees, I did not seek records for that time because I did not think it

was reasonable to submit such time and expense to this Court for reimbursement.  Ultimately, I determined that it was most fair to only submit time and expense that directly benefited the class, which, with the exception of certain work involving the testing of products, was all performed after the appointment of Leadership.  Additionally, there was no reasonable way to assure that any previously incurred time was not duplicative and was for the benefit of the Class.  While I do describe the time expended by Class Counsel and the Executive Committee during that period in this narrative for informational purposes, none of that time is included in the total hours, lodestar and expenses for which reimbursement is being sought.  The inclusion of these hours in the grid is simply for the reference of the Court, and for the Court to see the volume and scope of work that was performed in the initial investigation of the case by the Leadership.

44.     The total lodestar incurred and included in this fee application is $2,900,213.  The total of expenses incurred, for which reimbursement is sought, is 152,054.  Thus, when applying a multiplier for purposes of performing a lodestar cross check, the multiplier is approximately 2.7. I calculated this by taking the total amount sought ($8,000,000), and subtracting the total expenses ($152,054).  This leaves $7,847,946 available for fees, which I then divided by a lodestar of $2,900,213 to yield a multiplier of 2.7.

45.     This results in a fee percentage of 24.5%.  As detailed in the accompanying Memorandum in Support of Attorneys' Fees and Expenses, fee awards of up to 33% are regularly approved in the Eighth Circuit, and when a lodestar cross check is evaluated a multiplier of 2.7 is well within the range considered reasonable. Had all firms with lodestar calculated in Exhibit A charged billed at a maximum partner billing rate of $650, the lodestar cross check would still be below a 3.0.

46.     Attached as Exhibit A is a chart, by law firm, for each firm that performed any work at the direction of Class Counsel and for the benefit of the Class.  For each firm, the chart provides a breakdown of the hours and billing rate for each attorney or paralegal that expended time.  However, attorneys whose involvement was primarily document review were grouped together by firm and document review hours were billed uniformly at $300 per hour, which was the minimum seniority level involved in the review, irrespective of whether an attorney who reviewed and coded the documents was in fact more senior, and ordinarily billed at a higher billing rate.  During the process of compiling this Application, over 900 hours of time collectively incurred by Leadership was cut, either because it was incurred prior to the appointment of Leadership, or because the hours were found to be duplicative.  These eliminated hours reflect approximately $400,000 in hourly fees incurred that were excluded from the lodestar.

47.     Attached as Exhibit B is a chart summarizing the major litigation phases set forth in the rows, and each firm that expended hours (at the direction of Class Counsel and for the benefit of the Class) listed in the columns.  The resulting grid allows for a determination of whether a reasonable amount of time was expended in each area of litigation. I believe this chart is responsive to the request made by the Court at the Preliminary Approval Hearing and in conjunction with my declaration will permit the Court to fully evaluate the propriety of our expenditure of time.

48.     Attached as Exhibit C is a chart of the expenses incurred for which reimbursement is being sought.  Firms that ordinarily bill their clients for electronic research or office expenses such as copies, facsimiles, administration, or phone calls have included such expenses.  Specifically excluded were all filing fees and other expenses incurred prior to the

appointment of Leadership.  Duplicative initial filings simply do not provide a colorable benefit to the class. The great majority of expenses were expert fees andcosts associated with electronic discovery. Each member of the Leadership contributed $20,000 toward the payment of those common costs.

49.    Because the fee to be awarded in this matter is entirely contingent, the only certainty from the outset was that there would be no fee without a successful result, and that such a result would be realized only after a lengthy and difficult effort.

50.    Plaintiffs' success in this action was by no means assured.  Defendants were represented by able counsel, who raised numerous affirmative defenses, and were sure to mount a substantial challenge to class certification.  Were this settlement not achieved, and even if Plaintiffs prevailed at trial, Plaintiffs faced potentially years of costly and risky appellate litigation against Defendant, the ultimate success of which is far from certain. It are this risks that support the concept of lodestar multiplier and percentage recoveries.

51.    For all of the foregoing reasons, Class Counsel respectfully requests that this Court approve the Settlement, approve the Fee Application, and award class counsel $8,000,000 in fees and expenses.

52.    I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on May 12, 2016
Essex County, New Jersey.

_____
Scott A. Kamber

**EXHIBIT A**

**KamberLaw, LLC / LLP**

|  | Level | Seniority | Rate | Hours | Lodestar |
|---|---|---|---|---|---|
| SAK | Partner | >20 years | $700 | 547.20 | $383,040.00 |
| DK | Partner | >20 years | $680 | 545.50 | $370,940.00 |
| JPK | Attorney | 2008 | $375 | 198.20 | $74,325.00 |
| Doc Reviewer(s)* | Attorney | >3 years | $300 | 2,253.30 | $675,990.00 |
| CD | Paralegal | NA | $180 | 28.50 | $5,130.00 |
|  |  |  |  | 3,572.70 | $1,509,425.00 |

**The Simon Law Group**

|  | Level | Seniority | Rate | Hours | Lodestar |
|---|---|---|---|---|---|
| JGS | Partner | >20 years | $775 | 79.80 | $61,845.00 |
| RAK | Associate | 2009 | $400 | 383.60 | $153,440.00 |
| TMC | Associate | 2010 | $400 | 1.50 | $600.00 |
| Doc Reviewer(s)* | Attorney | >3 years | $300 | 976.90 | $293,070.00 |
| law clerk | Paralegal | NA | $180 | 35.90 | $6,462.00 |
| paralegal | Paralegal | NA | $180 | 15.4 | $2,772.00 |
|  |  |  |  | 1,493.10 | $518,189.00 |

**Gray, Ritter & Graham, P.C.**

|  | Level | Seniority | Rate | Hours | Lodestar |
|---|---|---|---|---|---|
| DMD | Principal | >20 years | $650 | 79.40 | $51,610.00 |
| GG | Principal | >20 years | $600 | 127.00 | $76,200.00 |
| JDS | Member | 2007 | $375 | 4.60 | $1,725.00 |
| KB | Member | 2008 | $300 | 161.00 | $48,300.00 |
| Doc Reviewer(s)* | Attorney | >3 years | $300 | 507.00 | $152,100.00 |
| JS | Paralegal | NA | $175 | 2.00 | $350.00 |
|  |  |  |  | 881.00 | $330,285.00 |

**Steelman, Gaunt & Horsefield**

|  | Level | Seniority | Rate | Hours | Lodestar |
|---|---|---|---|---|---|
| DS | Partner | >20 years | $700 | 58.70 | $41,090.00 |
| SG | Partner | >20 years | $550 | 278.00 | $152,900.00 |
| Doc Reviewer(s)* | Attorney | >3 years | $300 | 410.00 | $123,000.00 |
| JG | Paralegal | NA | $180 | 14.50 | $2,610.00 |
| WR | Paralegal | NA | $180 | 1.00 | $180.00 |
|  |  |  |  | 762.20 | $319,780.00 |

**Bursor & Fisher, P.A.**

|  | Level | Seniority | Rate | Hours | Lodestar |
|---|---|---|---|---|---|
| JIM | Partner | 2002 | $680 | 137.20 | $93,296.00 |
| FJK | Associate | 2013 | $350 | 354.80 | $124,180.00 |
| RSR | Paralegal | NA | $180 | 28.10 | $5,058.00 |
|  |  |  |  | 520.10 | $222,534.00 |

| | | GROSS TOTALS | | 7,229.10 | $2,900,213.00 |
|---|---|---|---|---|---|

*Document review time was always performed by attorneys familiar with the case and posessing no less than three years experience. Review time may include hours of reviewers at above listed firms as well as document reviewers from other firms for which listed firm had responsibility for document review and related analysis.

**EXHIBIT B**

**HOURS PER FIRM PER TASK**

(hours rounded to nearest whole number)

| | KLaw | SG&H | GR&G | SLG | B&F | TOTAL HOURS |
|---|---|---|---|---|---|---|
| Conduct initial investigation; draft & file complaints | | | | | | |
| Engage in MDL practice | | | | | | |
| Engage in lead counsel motion practice | | | | | | |
| Conduct further investigation, legal research; including evaluation of potential lead plaintiffs; preparation of amended complaint; planning, file organization and schedule due dates; prepare for and attend status conferences | 96 | 66 | 119 | 114 | 74 | 470 |
| Conduct discovery; including procedural tasks such as rule 16 report drafting; meet & confer with opposing counsel; attend conference; draft protective order & amended protective order; initial disclosures; informal discovery requests to Purina; prepare, serve and negotiate third party discovery; prepare for deposition; analyze pleadings and briefing schedules; prepare for and attend status conferences | 210 | 54 | 13 | 162 | 97 | 536 |
| Conduct discovery; including document review and analysis related; leadership coordination on task assignments, issues and strategy; analyze third-party complaints; prepare for and attend status conferences; purina materials | 2,569 | 498 | 511 | 1,003 | 11 | 4,592 |
| Respond to discovery requests; including document production, scheduling, client preparation, interaction and document preservation | 27 | 31 | 21 | 62 | 36 | 177 |
| Retention and working with experts; including evaluation of lab testing in discovery,research, hiring, work related to independent lab analysis, research re expert work, meetings. | 119 | | 1 | 48 | 5 | 173 |
| Prepare motion for class certification; including strategy, research, drafting and work with expert | 96 | 21 | | 4 | 68 | 189 |
| Mediation; including preparation, calls with mediator, attendance and travel thereto; follow up and mediation papers | 47 | | | 63 | 27 | 137 |
| Settlement; including continue negotiations; draft settlement agreement & notices; prepare papers for preliminary approval; prepare second amended complaint; attend prelim app hearing | 223 | 44 | 106 | 24 | 62 | 459 |
| Claims administration process; including management of notice campaign; calls and meetings with claims administrator and defendant; monitor claims process; class member contacts | 87 | | | 13 | 53 | 153 |
| Prepare papers for final approval | 49 | 24 | 55 | | 43 | 172 |
| | | | | | | |
| Total Hours | 3,572 | 762 | 881 | 1,493 | 520 | 7,229 |

**EXHIBIT C**

**EXPENSES, BY FIRM THAT PAID**

| | KLaw | SG&H | GR&G | SLG | B&F | TOTAL |
|---|---|---|---|---|---|---|
| Office expense (phone/fax/copies) | * | $69.12 | $1,019.81 | $470.85 | * | $1,559.78 |
| Electronic Research & PACER | * | $31.40 | $5,434.72 | $330.11 | $470.74 | $6,266.97 |
| Electronic Discovery Services | $37,809.33 | | | | | $37,809.33 |
| Expert Witness Fees | $77,800.00 | | | $3,726.74 | | $81,526.74 |
| Transcripts | $3,925.00 | | | | $462.12 | $4,387.12 |
| Travel and Meals | $11,954.95 | $1,188.16 | | $2,456.84 | $4,904.63 | $20,504.58 |
| Total: | $131,489.28 | $1,288.68 | $6,454.53 | $6,984.54 | $5,837.49 | $152,054.52 |

*These expenses have not been billed for this matter by the applicable firms.
** Each member of the executive committee contributed $20,000 to the expenses
incurred for expenses disbursed by KamberLaw.