**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**


| | | |
|---|---|---|
| IN RE: BLUE BUFFALO COMPANY, | ) | |
| LTD. MARKETING AND SALES | ) | |
| PRACTICES LITIGATION | ) | Case No.  4:14 MD 2562 RWS |
| | ) | |
| | ) | |
| RELATES TO:  ALL CASES | ) | |


**PLAINTIFFS' OMNIBUS RESPONSE TO OBJECTIONS TO THE**
**FINAL APPROVAL OF THE SETTLEMENT**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ........................................................................................................ 1

I.  THE OBJECTIONS MISCONSTRUE THE TERMS AND IMPORT OF
    THIS SETTLEMENT ....................................................................................... 3

    A.  Class Settlements In Product Cases Routinely Provide For Variable
    Relief Depending On Whether Class Members Have Proofs of
    Purchase .................................................................................................... 3

    B.  This Settlement Is Not The Appropriate Forum to Resolve Unique
    Individual Claims Regarding Alleged Harm Suffered By Pets .......................... 6

    C.  The Settlement Provided the Best Practical Notice to the Class ...................... 8

II.  THE PROFESSIONAL OBJECTIONS ARE MERITLESS ................................................ 9

III.  The Objections To The Adequacy Of The Settlement Are Meritless ................................ 11

IV.  Choice Of Law Issues Do Not Defeat The Settlement ...................................................... 14

V.  The Settlement Is Designed To Pay All Funds To Claimants ............................................ 17

VI.  The Professional Objectors Incorrectly Assert That The Court Should
    Calculate A Percentage Fee On Less Than The Entire Common Fund .......................... 18

VII.  The Objectors' Arguments For Application Of Anything Other Than The
    Eighth Circuit's 25% Benchmark Are Meritless ............................................................. 19

CONCLUSION ...................................................................................................... 22

## TABLE OF AUTHORITIES

**Cases**

*9-M Corp. v. Sprint Commc'ns Co. L.P.*,
  2012 WL 5495905 (D. Minn. Nov. 12, 2012) ................................................. 18

*Amchem*,
  521 U.S. at 620 ................................................................................................. 17

*Barfield*,
  2015 WL 3460346 ...................................................................................... 18, 21

*Barnes v. Fleetboston Fin. Corp.*,
  2006 WL 6916834 (D. Mass. Aug. 22, 2006) ..................................................... 9

*Bezdek v. Vibram USA, Inc.*,
  809 F.3d 78 (1st Cir. 2015) ............................................................................... 4

*Brown v. Wells Fargo Bank, N.A.*,
  25 F. Supp. 3d 144 (D.D.C. 2014) ................................................................... 15

*Gold v. New York Life Ins. Co.*,
  730 F.3d 137 (2d Cir. 2013) ............................................................................ 16

*Gotthelf v. Toyota Motor Sales, U.S.A., Inc.*,
  525 F. App'x 94 (3d Cir. 2013) ........................................................................ 17

In *re AT&T Mobility Wireless Data Servs. Sales Tax Litig.*,
  789 F. Supp.2d 935 (N.D. Ill. 2011) ................................................................ 17

*In re Cardinal Health, Inc. Sec. Litig.*,
  550 F. Supp. 2d 751 (S.D. Ohio 2008) ............................................................ 10

*In re Checking Account Overdraft Litigation*,
  830 F.Supp.2d 1330 (S.D. Fla. 2011) ................................................................ 2

*In re Countrywide Fin. Corp. Customer Data Sec. Breach Litig.*,
  2010 WL 3328249 (W.D. Ky. Aug. 24, 2010) ................................................. 10

*In re Gen. Elec. Co. Securities Litig.*,
  998 F. Supp. 2d 145 (S.D.N.Y. 2014) .............................................................. 10

*In re Law Office of Jonathan E. Fortman, LLC*,
  2013 WL 414476 (E.D Mo. Feb. 1, 2013) ....................................................... 11

*In re Mex. Money Transfer Litig.*,
  267 F.3d 743 (7th Cir. 2001) ........................................................................... 17

*In re Nat'l Collegiate Athletic Ass'n Student-Athlete Concussion Injury Litig.*,
  2016 WL 305380 (N.D. Ill. Jan. 26, 2016) ...................................................... 17

*In re Polyurethane Foam Antitrust Litig.*,
  1:10 MD 2196, 2016 WL 320182 (N.D. Ohio Jan. 27, 2016)................................................... 18

*In re Wireless Tel. Fed. Cost Recovery Fees Litig.*,
  2004 WL 3671053 (W.D. Mo. Apr. 20, 2004) ...................................................................... 15

*In re Zurn Pex Plumbing Products Liab. Litig.*,
  08-MDL-1958 ADM/AJB, 2012 WL 5055810 (D. Minn. Oct. 18, 2012)................................ 7

*Klier v. Elf Atochem N. America, Inc.*,
  658 F.3d 468 (5th Cir.2011) .................................................................................................. 18

*Ko v. Natura Pet Products, Inc.*,
  2012 WL 3945541 (N.D. Cal. Sept. 10, 2012) ...................................................................... 17

*Marshall v. Natl. Football League*,
  787 F.3d 502 (8th Cir. 2015) ................................................................................................. 16

*Marty v. Anheuser-Busch Companies, LLC*,
  2015 WL 6391185 (S.D. Fla. Oct. 22, 2015) ........................................................................ 20

*McCrary v. Elations Co., LLC*,
  2016 WL 769703 (C.D. Cal. Feb. 25, 2016) ......................................................................... 12

*Orleans Par. Sch. Bd. v. Asbestos Corp.*,
  114 F.3d 66 (5th Cir. 1997) ..................................................................................................... 7

*Orleans Par. Sch. Bd. v. U.S. Gypsum Co.*,
  892 F. Supp. 794 (E.D. La. 1995)............................................................................................ 7

*Shady Grove Orthopedic Associates. P.A. v. Allstate Insurance Company*,
  559 U.S. 393, 130 S. Ct. 1431 (2010) .................................................................................. 16

*Simon v. Toshiba Am.*,
  C 07-06202 MHP, 2010 WL 1757956 ...................................................................................... 4

*Smith v. Questar Capital Corp.*,
  2015 WL 9860201 (D. Minn. Sept. 11, 2015)....................................................................... 19

*Sullivan v. DB Invs., Inc.*,
  667 F.3d 273 (3d Cir. 2011) .................................................................................................. 17

*Wilson v. Airborne, Inc.*,
  EDCV 07-770 VAP(OPX), 2008 WL 3854963 ....................................................................... 4

**Rules**
Fed. R. Civ. P. 23(c)(2)(B) ........................................................................................................ 7, 8

iii

## INTRODUCTION

Of the several million people who received notice of the Settlement of this case over 100,000 submitted claims.  And of the claiming class members, only 14 timely submitted and maintained objections to the Settlement.[1]  The objections fall into two groups:

First, objections submitted by individuals who do not appear to regularly object to class settlements, which includes Ms. Albea, Ms. Combs, Mr. Duggar, Ms. Johnson, Ms. Kansas, Ms. Maritozzi, Ms. McCoy, Ms. Miller, Ms. Nadola, Ms. Philippus, and Ms. Sanders ("Objections"). The Objections generally take issue with the amount offered in settlement, including because the settlement does not adequately compensate for health problems suffered by their pets, and because a proof of purchase is required to receive a benefit under Option 2.  These Objections, although sincere, are largely based on misunderstandings about the class action generally, or the relief provided by this Settlement.  This Settlement provides a remedy for misrepresentations made by Blue Buffalo in connection with its True Blue Promise.  As is frequently the case in class cases involving consumer products, the Settlement provides for an increased recovery to people who have proofs of purchase, such that it affords an even greater benefit to the class while discouraging fraudulent claims.  In addition, although Counsel is sympathetic to class members who have suffered the illness of a pet, this Settlement was not designed to address that type of injury.  Instead, the Settlement provides an opt-out right so that, in the event of divergent or significant harm, individuals may excuse themselves from the settlement to preserve and separately pursue their claims.

---

[1] As of the date of this filing, Class Counsel has received 17 objections, of which 16 were timely filed.  Of those 16, two objecting parties have indicated their intent to withdraw their objections following conversations with Class Counsel or Executive Committee members, wherein Counsel explained the fairness of the Settlement achieved, and that it will continue to vehemently advocate for this Settlement.  No additional compensation was provided to any objector to persuade them to withdrawal.

Second, objections submitted by individuals who serially object to class settlements, and/or who are represented by attorneys that routinely object to such settlements, which includes: Mr. Lopez, Ms. Houser, Mr. Sibley, Mr. Bacharach, and Ms. Sweeny ("Professional Objections" or "Professional Objectors").  The Professional Objections generally interpose objections that they hope would be of interest to an Appellate Court, and do so in a veiled attempt to maximize the chance of extracting a payment from the parties in order to drop (or to persuade their client to drop) their objection.  *See, e.g., In re Checking Account Overdraft Litigation*, 830 F.Supp.2d 1330, 1361, n. 30 (S.D. Fla. 2011) ("[P]rofessional objectors can levy what is effectively a tax on class action settlements, a tax that has no benefit to anyone other than to the objectors.  Literally nothing is gained from the cost: Settlements are not restructured and the class, on whose benefit the appeal is purportedly raised, gains nothing.").[2]  Here, these issues include the language of the Release, the value of and requirements for obtaining the relief provided, the attorneys' fees and expenses sought, and distinctions between class members over perceived divergences in state law claims.  The Professional Objections are without merit and not well taken.  Moreover, the Professional Objections offer little or no basis for their assertions, which are readily disputed by the information contained in the Memorandum in Support of Motion for Final Approval of Class Settlement ("Motion for Final Approval"). Dkt. No. 198.  No effort was made by any of the Professional Objectors to reach out to counsel prior to lodging an objection in order to better understand the Settlement or improve the Settlement.  Instead, the Professional Objectors seek to ransom a $32 million benefit without any good faith basis of success.  It is unfortunate, but it

---

[2] Should any Objectors attempt to take an appeal from an order of this Court granting final approval to the Settlement or an award of attorneys' fees, Plaintiffs will seek appeal bonds from such Objectors to protect against the cost of delay, and other expenses associated with what are sure to be frivolous appeals.

seems that, the greater the settlement amount, the more Professional Objectors perceive there to be a possible payday for themselves, without regard for the rest of the class members.[3]

As such, Alexia Keil, Nick Hutchison, Rachael D. Stone, Maja Mackenzie, Jonathan Fisher, David Delre, Beth Cox, Lori Canale, and Derek McCusker, on behalf of themselves and all others similarly situated ("Class Representatives" or "Plaintiffs") respectfully submit this Omnibus Response to Objections to approval of the settlement reached with Defendant, Blue Buffalo Company, Ltd.  ("Blue Buffalo" or "Defendant"), and respectfully request that the Court overrule the objections in their entirety.

## I.     THE OBJECTIONS MISCONSTRUE THE TERMS AND IMPORT OF THIS SETTLEMENT

Of the more than 100,000 claims received in this case, less than 00.02% of class members objected to this settlement.  This metric alone demonstrates that the vast majority of the class favors the relief proposed, and that recovery for the majority should not be sacrificed due to the personal objections of the very few.  *See* Motion for Final Approval at 1.  Moreover, the Objections are based in large part on misconceptions about class action procedure.

### A.     Class Settlements In Product Cases Routinely Provide For Variable Relief Depending On Whether Class Members Have Proofs of Purchase

The most common objection, advanced in nearly half of the Objections, asserts that the settlement is unfair because class members must provide proofs of purchase to be eligible under Option 2.  *See, e.g.*, Combs Objection at ¶ 1 (Dkt. No. 169); Duggar Objection ¶ 10 (Dkt. No. 175); McCoy Objection at 1 (Dkt. No. 180); Miller Objection at 1 (Dkt. No. 174); and Philippus Objection at 1 (Dkt. No. 178)[4]  This objection, however, is misplaced because class settlements

---

[3] Plaintiffs deposed several of the Professional Objectors, including Lopez, Houser, Sibley, and Sweeney.  It is the substance of these depositions and the record of these Professional Objectors in other cases that provides the basis for Plaintiffs' assertions and tone herein.

[4] Similarly, Professional Objectors Lopez (Objection at 5-6 (Dkt. No. 182)) and Sibley (Objection at 1 (Dkt. No. 186)), attempt to take issue with the variations between Option 1 and Option 2 claimants.

3

in product cases frequently provide an enhanced recovery for individuals who provide proofs of purchase.  *See, e.g., Bezdek v. Vibram USA, Inc.*, 809 F.3d 78, 81 (1st Cir. 2015) (affirming final approval of settlement which allowed "[r]efunds for up to two pairs of shoes could be obtained by submitting only a valid Claim Form.  Class members seeking a refund for more than two pairs of shoes would be required to submit a Claim Form plus proof of purchase."); *Wilson v. Airborne, Inc.*, EDCV 07-770 VAP(OPX), 2008 WL 3854963, at *3 (C.D. Cal. Aug. 13, 2008) ("Eligible class members who submit claims can be reimbursed for the purchase price of any Airborne product with a proof of purchase . . . . Class members who do not have proofs of purchase can be reimbursed for the purchase price of up to six packages of Airborne."); *Simon v. Toshiba Am.*, C 07-06202 MHP, 2010 WL 1757956, at *1 (N.D. Cal. Apr. 30, 2010) ("Class members 'with proof sufficient to establish that they incurred out-of-pocket expenses' may be entitled to reimbursement for their reasonable costs incurred . . . .").  The reason for this is that, absent a stop-gap such as a proof of purchase, enhanced recoveries would encourage consumer fraud.  *See generally* Wilson, 2008 WL 3854963, at *8  (requiring proofs of purchase for claims filed for more than 6 boxes of product; and resolving an objector's concern that fraudulent claims may be filed for less than 6 boxes, which do not require a purchase receipt).

        In addition, proofs of purchase are readily available in this action.  Between 70-75% of the products at issue that were sold in the past three years were sold through big box retailers that have loyalty programs, which maintain consumer purchase records.  *See* 2015 Blue Buffalo Pet Products, Inc. 10-K Report at 42, appended to the Declaration of Deborah Kravitz ("Kravitz Decl."), Ex. C ("Over the last three years, we have diversified our customer base, with 70% of our net sales generated from national pet superstores in 2015 as compared to 75% in 2013.").  The settlement website clearly and accurately informed class members that such information was provided by certain retailers, and provided information on how such proof could be obtained

4

from retailers, including screen shots from certain retailers.  Objector Phillipus argues that the fact that not all retailers provide such purchase tracking disadvantages certain purchasers.  *See* Phillipus Objection, at 1.  ("[u]nless one has shopped consistently at a big box pet store such as PetSmart or Petco, there is no way that a true purchase history can be obtained").  In virtually every product case, however, class members will purchase product from retailers with different capabilities for, and offerings on, tracking purchases (or numerous other elements of the purchase experience) and we have not found a single example where a Court has denied approval of a settlement based on such differing practices.

Furthermore, to the extent the Objectors assert that they will not obtain a substantial recovery under Option 1, the pro rata increase in claims remedies this misconception.  According to Mr. Pakter, an accounting and financial analysis expert, all valid Option 1 claims "will result in a payment of at least 100% of the purchase price for up to $100.00 of purchases for Settlement Class members who do not have a valid proof of purchase."  *See* Affidavit of Michael David Pakter, Dkt. No. 198-3 ("Pakter Aff.") ¶13(l).  *See also* Declaration of Jeanne A. Finegan, Dkt. No. 198-2 ("Finegan Decl.") ¶46 ("Based upon the actual claims experience, all valid claimants will now be paid their full valid/normalized claim amount, plus an approximate pro rata increase of 11 percent over their valid claimed purchase amount.").  Thus, the Objections that contend class members will only receive a nominal amount, or $10, under Option 1 are incorrect.  *See* Maritozzi Objection at 1 (Dkt. No. 176) ("I am writing this letter because I am very upset about settlement monies that will be given, based on what I paid for the food.").  As with Option 1, Option 2 claims will be increased pro rata.  *See Finegan Decl.* at ¶45 ("Pursuant to the terms of the Settlement Agreement section 2, paragraph 2.8 Heffler made Pro Rata Adjustments to the claim amounts.  The same pro rata increase was applied to Option 1 and Option 2 claims.").

Professional Objector Lopez similarly asserts that the option to submit proofs of purchase "unfairly treats similarly situated class members differently in violation of Rule 23(a)(4). Specifically, it rewards class members differently based on whether they kept receipts dating back eight years."  See Lopez Objection, Dkt. No. 182, at 8.  As described above, this procedure is commonplace in consumer product settlements, and purchase records are available.  In addition, the core of Lopez's objection appears to misconstrue the settlement:  "These groups – those with receipts and those without – are ostensibly in conflict with each other, and, <u>to the extent they have the same representatives</u>, the class should not be certified under Rule 23(a)(4)." *Id.* (emphasis added).  Both groups of individuals – those with and without proofs of purchases – are separately and adequately represented by individual Class Representatives.  *See, e.g.,* Hutchison Claim Form, Kravitz Decl., Ex. A (representing individuals without proofs of purchase); and Canale Claim Form, Kravitz Decl. Ex., B (representing individuals with proofs of purchase).  It also bears noting that both Mr. Hutchison and Ms. Canale, who were represented by separate counsel, both reviewed and approved the Settlement as fair prior to its execution. Kravitz Decl. at ¶¶25-26.[5]  One thing is certain: there will be fewer class members with proofs of purchase two years from now than there are today, so rejecting this settlement and sending this case down the long road to trial will in no way remedy this objection, or make the class better off.

## B. This Settlement Is Not The Appropriate Forum to Resolve Unique Individual Claims Regarding Alleged Harm Suffered By Pets

This Settlement addresses claims stemming from the price premium paid due to false advertising and breached warranties for Blue Buffalo products, not injury to animals.  Despite

---

[5] Moreover, while Lopez complains about the proof of purchase requirement, he admittedly did not try to search for records despite being a member of loyalty programs.  *See* Lopez Dep. 24:3-8, Kravitz Decl., Ex. F ("Q:  Did you make any effort to obtain receipts showing Blue Buffalo purchases through the loyalty programs at either -- A:  No, I did not.  Q:  You did not? … A:  No, I did not.").

this fact, a number of Objections contend the Settlement is inadequate because it does not provide compensation for the harm allegedly suffered by class member's pets.[6]  *See, e.g.*, Philippus Objection at 2 (asking the court "to make the compensation compatible with the expenses they have incurred including payment for veterinarian bills."); *see also* Albea Objection at 2  ("I will not see any of the money that it actually cost me with this class action suit.  All in all I spent over $3,000 [f]or the surgery."); Combs Objection at 1 (Dkt. No. 169); Maritozzi Objection at 1 (Dkt. No. 176).  This Settlement, however, is not the appropriate forum for these claims.  There are no product liability causes of action asserted in this case, rather, the class is based on violations of consumer protection statutes and warranty laws.  *See* First Amended Consolidated Complaint, Dkt. No. 165 at 23-49.  If class members wish to assert claims related to injury to pets, the opt out process – rather than an objection – provides the appropriate method for them to do so.  Fed. R. Civ. P. 23(c)(2)(B) ("The notice must clearly and concisely state . . . (v) that the court will exclude from the class any member who requests exclusion . . . .");  *See Orleans Par. Sch. Bd. v. U.S. Gypsum Co.*, 892 F. Supp. 794, 804 n.15 (E.D. La. 1995), *aff'd sub nom. Orleans Par. Sch. Bd. v. Asbestos Corp.*, 114 F.3d 66 (5th Cir. 1997) ("The plaintiff correctly contends that the purpose of the notice of the right to opt out is to give individual class members the opportunity to pursue their own claims for personal monetary relief."); *In re Zurn Pex Plumbing Products Liab. Litig.*, 08-MDL-1958 ADM/AJB, 2012 WL 5055810, at *10 (D. Minn. Oct. 18, 2012) (finding that notice satisfied due process requirements where it explained "the action, the definition of the Settlement Class, and the right to opt out or appear through an attorney.")

---

[6] Class Counsel is readily familiar with and sympathetic to claims of sick or injured pets, having served as co-lead counsel in the *In re Menu Foods* action, which specifically dealt with physical harm to pets.

### C.      The Settlement Provided the Best Practical Notice to the Class

The Duggar Objection also appears to object that the notice was insufficient because it did not provide notice of the Settlement at retail locations that sell Blue Buffalo products.  *See* Duggar Objection ¶¶ 14-15 ("[T]he retailers along with Blue Buffalo bear a responsibility to put signage in a prominent place, preferably next to the product, informing the customer of the settlement and how to file a claim.").[7]  The retailers, however, are not parties to or implicated by this Settlement, thus, they have no legal obligation to take action pursuant to it.  In addition, the Notice program, which was preliminarily approved, did not contain any such term.  *See* Preliminary Approval Order ¶ 12 ("The Court finds that, taken together, the Publication Notice and Class Notice, along with the Settlement Website and Media Plan (the "Class Notice" or "Settlement Class Notice Program") (a) are the best practicable notice, (b) reasonably calculated, under the circumstances, to apprise Settlement Class Members of the pendency of the Action . . . .").  Furthermore, Federal Rule of Civil Procedure 23(c)(2)(B) merely requires "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort."  Plaintiffs have satisfied this standard.

The reasonableness of the Notice is further confirmed by its ultimate effectiveness and its conformance with due process standards.  According to the Claims Administrator, 56 percent of the class was reached by direct notice.  Finegan Decl. ¶ 30.  When the extensive publication notice – which included print, online, mobile and social media – is accounted for, approximately 87 percent of the class received notice of the Settlement with an average frequency of 4.0 times. Finegan Decl. ¶¶11, 30, and 49.  As such, the fact that some Class Members alone did not receive direct notice is not a basis to deny final approval.  The effectiveness of the Notice is

---

[7] Objector Duggar similarly contends that "[t]he most egregious reason why the proposed Blue Buffalo settlement should be rejected is the response of the retailers who profited off of the sale of the product and yet bear no responsibility for their part in defrauding their customer(s)."  Duggar Objection ¶ 13.

further confirmed by the fact that even objectors who did not receive direct notice learned of the settlement in time to file a timely objection.[8]

## II.     THE PROFESSIONAL OBJECTIONS ARE MERITLESS

Although allowing class members to object provides an important safeguard against collusive or unfair settlements, a troubling abuse of this procedure has developed in recent years. A certain portion of the bar has turned class action objections into a cottage industry, objecting to class action settlements as unfair, inadequate, and unreasonable, regardless of the benefits to class members and merits of the settlement.  Rather than serve a useful purpose, this practice has needlessly added years of delay to the conclusion of litigation and class members' receipt of the settlement proceeds, and placed a drain on judicial resources.

Many courts have voiced genuine concern about serial objector counsel and their tactics. It is well-established that some "serial" or "professional" objectors extract payments from parties in the litigation to avoid years of delay due to their unmeritorious settlement objections:

> Repeat objectors to class action settlements can make a living simply by filing frivolous appeals and thereby slowing down the execution of settlements.  The larger the settlement, the more cost-effective it is to pay the objectors rather than suffer the delay of waiting for an appeal to be resolved (even an expedited appeal). Because of these economic realities, professional objectors can levy what is effectively a tax on class action settlements, a tax that has no benefit to anyone other than to the objectors.  Literally nothing is gained from the cost: Settlements are not restructured and the class, on whose behalf the appeal is purportedly raised, gains nothing.

*Barnes v. Fleetboston Fin. Corp.*, 2006 WL 6916834, at *1 (D. Mass. Aug. 22, 2006).  As another court observed:

> [C]lass actions also attract those in the legal profession who subsist primarily off of the skill and labor of, to say nothing of the risk

---

[8] *See, e.g.*, Maritozzi Objection at 1 ("Just one week ago, I see on Facebook, Blue Class Action Settlement Claim form, based on the food I purchased."). Such social media advertising was not even required to achieve due process notice but was part of the Claim Stimulation Program that provided supplemental notice during the notice period. Finegan Decl. ¶¶35-37.

> borne by, more capable attorneys.  These are the opportunistic
> objectors.  Although they contribute nothing to the class, they
> object to the settlement, thereby obstructing payment to lead
> counsel or the class in the hope that lead plaintiff will pay them to
> go away.  Unfortunately, the class-action kingdom has seen a
> Malthusian explosion of these opportunistic objectors, which now
> seem to accompany every major securities litigation.

*In re Cardinal Health, Inc. Sec. Litig.*, 550 F. Supp. 2d 751, 754 (S.D. Ohio 2008).  "[T]oo much of the controversy in many class action litigations seems to center on the issue of attorneys' fees" and that, as a result, "a cottage industry has developed of professional objectors, where again the emphasis or at least the primary motivation is attorneys' fees."  *In re Countrywide Fin. Corp. Customer Data Sec. Breach Litig.*, 2010 WL 3328249, at *4 (W.D. Ky. Aug. 24, 2010).

Here, Class Counsel believes the objections advanced by Sibley, Bacharach,[9] Lopez, Houser, and Sweeney constitute Professional Objections.  *See*

http://www.serialobjector.com/persons/421 (Gary Sibley) (last visited May 12, 2016);

http://www.serialobjector.com/persons/154 (Pamela Sweeney) (last visited May 12, 2016);

http://www.serialobjector.com/persons/35 (N. Albert Bacharach) (last visited May 12, 2016);

http://www.serialobjector.com/persons/4 (Christopher Bandas) (last visited May 12, 2016).[10]  In addition, counsel for Ms. Houser, Fairfax Jones, is a serial objector who appears to have obtained his client through Google Adwords.  *See* Houser Depo. Trans at 16:11-18.  At deposition, Ms.

---

[9] Notably, Bacharach has indicated that he intends to withdraw his objection.  *See* Marchese Decl. ¶7.

[10] Although not formally on the papers, Lopez is represented by Christopher Bandas.  *See* Lopez Objection at 2 ("Objector is represented by … Bandas Law Firm, PC.  Chris Bandas of Bandas Law Firm does not presently intend on making an appearance for himself or his firm.").  Mr. Bandas has been acknowledged and cited as a professional objector.  *See In re Gen. Elec. Co. Securities Litig.*, 998 F. Supp. 2d 145, 156 (S.D.N.Y. 2014) (discussing a California case wherein the court struck an objection "having determined that 'Mr. Bandas was attempting to pressure the parties to give him $400,000 as payment to withdraw the objections and go away' and that 'Mr. Bandas was using the threat of questionable litigation to tie up the settlement unless the payment was made.'")

Houser was unaware of whether her counsel was being paid or was working pro bono, and stated that she could not recall entering into a retainer agreement.  Her counsel, Mr. Jones, confirmed that no retainer agreement had been provided.  *Id.* at 17:22-2.  This appears to be a violation of the Missouri ethics law.  *See* Mo. Sup. Ct. 4-1.5 ("The scope of the representation and the basis or rate of the fee and expenses for which the client will be responsible shall be communicated to the client, preferably in writing . . . . A contingent fee agreement shall be in a writing signed by the client and shall state the method by which the fee is to be determined . . . .").

As such, the Court should afford less weight to the objections from the professional objectors given their self-motivated nature and checkered history.  *See In re Law Office of Jonathan E. Fortman, LLC*, 2013 WL 414476, at *5 (E.D Mo. Feb. 1, 2013) ("when assessing the merits of an objection to a class action settlement, courts consider the background and intent of objectors and their counsel, particularly when indicative of a motive other than putting the interest of the class members first").

## III.     The Objections To The Adequacy Of The Settlement Are Meritless

As described in detail in the Motion for Final Approval, the Settlement in this case is fair and reasonable, and was achieved as a result of the diligent efforts of counsel for the parties.  *See* Motion for Final Approval, Dkt. No. 198, at 9-19.  Rather than address any specific finding of the Court in granting preliminary approval or any element of this case, the Professional Objectors interpose blanket objections that the settlement is unreasonable.  *See, e.g.,* Houser Objection at 2 (Dkt. No. 179) ("Plaintiffs have not demonstrated the reasonableness of the proposed Settlement Relief.  Plaintiffs must provide a reasonable value to the class claims."); Sibley Objection at 3 (claiming that the settlement "is not fair, reasonable or adequate to the class members who are giving up much and receiving little.").  These claims are simply wrong, and as discussed below, did not hold up under cross-examination.  Plaintiffs have described in

11

great detail, and beyond what is required in this circuit, the merits and adequacy of the settlement.  *See* Motion for Final Approval, Dkt. No. 198, at 9-19.  Among other things, Plaintiffs have submitted the Pakter Affidavit, which provides economic support for the benefit and reasonableness of the Settlement.[11]

As Mr. Pakter explains, "the total price premium on the chicken byproduct representation is estimated to be approximately $150 million.  The $150 million reflects the total damages available to the Class after a successful verdict after a full trial and any appeals."  Pakter Aff. ¶ 16.  Once discounted, "the present value of a full verdict at the end of a trial, all appeals, and the claims administration process, is approximately $115 million."  *Id.* ¶ 20.  Accordingly, the "$32 million settlement amount as a percentage of a maximum possible full verdict at trial of $115 million is 27% ($32 million/$115 million)."  *Id.*  ¶ 21.  A recovery for the Class amounting to 27% of the maximum value of the claims if litigated is a great result.  *See McCrary v. Elations Co., LLC*, 2016 WL 769703, at *8 (C.D. Cal. Feb. 25, 2016) ("Class Counsel estimates that the maximum amount of recovery that the Settlement Class could have obtained absent the settlement ranged from $279,259 to $2.2 million. …  An aggregate recovery of $201,022 roughly amounts to between 9% and 71% of the damages the Settlement Class could have recovered. … This degree of recovery is consistent with amounts routinely found to be fair and reasonable.").

In contrast to this economic evidence in support of the Settlement, at deposition, Mr. Sibley was not even able to state why the settlement was unfair.  As Mr. Sibley testified, he did nothing to determine if $32 million – or any other amount – was fair.  *See* Sibley Dep. at 81:7-10, Kravitz Decl., Ex. E ("Q:  Did you do anything to analyze what amount of settlement

---

[11] Mr. Pakter has "more than 35 years of experience in accounting, forensic accounting, financial analysis, financial forensics, business economics, and fraud examinations and investigations, including more than 15 years of experience in economic damages and business valuations," including more than 10 professional certification in his field.  Pakter Aff. ¶¶ 2-6.

consideration for the class would be fair for a resolution of this case?  A:  The answer is:  No.").
Accordingly, Sibley's objection is baseless.

Similarly, without articulating a basis for the objection, Ms. Sweeney "object[s] to the
cap of $200 dollars for each class member.  Class members who provide 'proof of purchase' are
limited to compensation not to exceed $200 dollars.  This is limiting given the 32 million dollar
settlement."  Sweeney Objection at 1 (Dkt. No. 184).[12]  First, Ms. Sweeney is factually wrong.
There is in fact no "cap" of $200 since the referenced $200 arises from the 10% price premium
applied to the maximum valid purchase amount of $2,000.  Here, after the application of the pro
rata increase, each claimant will receive more than the amount of their valid/normalized
purchases.  *See* Pakter Aff. ¶ 13(l); Finegan Decl. ¶ 46.  Second, Ms. Sweeney admits she lacks
standing, for she is not actually affected by the $200 cap:

> Q:  Does the $200 cap affect you in this case?
>
> A·  ·It does not affect me personally, no.

Sweeney Dep. at 57:12-13, Kravitz Decl., Ex. D; *id.* at 75:12-19 ("Q:  So why are you objecting
to this given that it doesn't affect you?  A:  Because I'm looking out for the class and the other
people who can't -- who wouldn't object or wouldn't know how or wouldn't voice an objection
regarding that.").

Not only does Sweeney lack standing to object on this ground, but her credibility is called
into question by her conduct as serial objector to settlements in prior cases.  Despite initially
testifying that she had never received compensation in connection with any prior objection,
Sweeney Dep. at 72:7-9, Kravitz Decl. Ex. D, she relied on the existence of a non-disclosure
agreement to avoid admitting to taking payoffs to withdraw appeals.

---

[12] Sweeney's concerns are also echoed by other objectors.  *See* Combs Objection at 1; Kanas
Objection at 1 (Dkt. No. 170); Philippus Objection at 1; Albea Objection at 2 (Dkt. No. 185);
Sanders Objection at 1 (Dkt. No. 189).

Q:  Have you ever been paid to withdraw your objection to a class action settlement?

A:  I'm not at liberty to discuss anything of that nature.

*Id.* at 72:13-16; *see also id.* at 68:14-20 ("Q:  Have you ever appealed one of your prior objections?  A:  Yes.  Q:  Do you know which one?  A:  I'm not at liberty to discuss that.  Q: Why not?  A:  I signed a nondisclosure.").

In any case, these objections are not well taken.  At least one Class Member opted-out and brought claims against Blue Buffalo in small claims court on March 3, 2016 seeking damages totaling $4,999, for which he had proof of purchases amounting to approximately $1,100.  *See* 3/3/16 Kevin Stethem Notice of Claim, Kravitz Decl., Ex. G.  He was awarded a judgment of $500 on April 1, 2016, thus reflecting a damages award of 10% of the total claimed damages, and approximately 45% of his purchases for which he had receipts.  *See* 4/1/16 Stethem Judgment, Kravitz Decl., Ex. H.  Here, by contrast, Class Members who provided proof of purchase will receive "at least 100% of the purchase price for up to $2,000.00 of purchases thus requiring a pro rata increase."  Pakter Aff. ¶ 13(m).  As Mr. Stethem's opt-out demonstrates, Class Members will likely receive significantly **more relief as part of the settlement class** than they could obtain if they sought to recover individually from Blue Buffalo.  Indeed, had Mr. Stethem simply filed a claim with his proof of purchase, he would have recovered double what he did in small claims court.

## IV.   Choice Of Law Issues Do Not Defeat The Settlement

At settlement, as opposed to during litigation, differences between state laws or choice of law provisions are immaterial.  The Professional Objections, however, wholly ignore this precept, ignore the actual facts of this case, and contend that the settlement fails to account for differences among state laws.  This objection is not only short sighted, but overlooks the fact that the Complaint also asserts nationwide claims.  *See* Consolidated Complaint, Dkt. No. 165,

14

Counts I-IV (alleging claims for violation of Magnuson-Moss Warranty Act, Breach of Express

Warranty, Breach of Implied Warranty of Merchantability, and Unjust Enrichment).  The Houser

Objection, for example, argues that since "the Settlement unfairly releases state law claims that

were never pled and the Named Plaintiffs do not adequately represent absentee states . . . . the

Release should, therefore, be limited to Missouri, Illinois, New York, New Jersey, California,

Florida, Ohio, Massachusetts, and Connecticut," Houser Objection at 3, 5.  This contention is

incorrect.  As Judge Gaitan previously explained:

> Variations from state-to-state in the form of state law claims would
> always prevent a nationwide settlement, thereby defeating the
> efficiencies of the class action settlement mechanism. Such a
> position is plainly against the public policy favoring class action
> settlements and courts frequently and routinely approve nationwide
> class settlements, including consumer class actions involving state
> law claims.  … This objection provides no basis to defeat the
> settlement.

*In re Wireless Tel. Fed. Cost Recovery Fees Litig.*, 2004 WL 3671053, at *15 (W.D. Mo. Apr.

20, 2004) (internal citations omitted); *see also Brown v. Wells Fargo Bank, N.A.*, 25 F. Supp. 3d

144, 151 (D.D.C. 2014) ("[T]o deny a nationwide class action settlement the ability to release

related state law claims, even on behalf of those class members not residing in the states with a

named plaintiff, could undermine the efficiency of class actions.  Furthermore, the laws of

different states in the area of consumer protection will always vary to some degree, but federal

policy favors class actions and settlements which resolve issues with as few separate actions as

practicable.").[13]

---

[13] Professional Objector Lopez also objects "[t]he settlement here releases potential claims beyond those arising out
of the identical factual predicate.  Under the release here, Blue Buffalo may engage in tortious conduct in an entirely
different marketing, advertising, or labeling campaign involving different products, and the putative class members
would ostensibly [sic] be barred from judicial relief."  Lopez Objection at 7-8.  Mr. Lopez is apparently "concerned"
that class members are releasing claims concerning "entirely different" future conduct that Blue Buffalo "may
engage in" with respect to "different products."  That concern is misplaced.  Only claims arising "prior to [the] Final
Settlement Approval Date" are being released.  Stipulation of Settlement, ¶ 6.1.  Moreover, the Release is limited to
claims concerning "any of the Blue Buffalo Products" set forth in Exhibit 1 to the Stipulation of Settlement, which is
identical to the Blue Buffalo Products at issue in this litigation.  *Compare* Stipulation of Settlement, Ex. 1 (Dkt. No.

Houser further objects that "[t]he Settlement should not equally compensate Class Members where differences in state law would either preclude or limit damages.  The proposed Settlement does not address material differences across each state's consumer protection laws." Houser Objection at 3.[14]  However, Plaintiffs seek certification of a settlement class, not a litigation class.  As recognized by the Eight Circuit in *Marshall*, the district court's obligation in considering a settlement is to evaluate "the plaintiffs' *case* in its entirety rather than on a claim-by-claim basis."  *Marshall v. Natl. Football League*, 787 F.3d 502, 517 (8th Cir. 2015) (emphasis in original; quotations and citation omitted).  Recognizing that it was inappropriate for the district court to engage in a state-by-state choice of law analysis, the *Marshall* court found however that the risk of having to do so if litigation were to continue **weighed in favor of the settlement**.  *Id.* at 514-515 ("the choice-of-law inquiry [would be] extremely complex and weighs heavily against ultimate certification of the class" and "if Appellants are wrong about their likelihood of success along any step of the way, *all* plaintiffs will gain nothing . . . .") (emphasis added; internal citations omitted).  Thus, "the practical reality [is] that 'a class action *settlement* necessarily reflects the parties' pre-trial assessment as to the potential recovery of the entire class, with all of its class members' varying claims.'"  *Id.* at 520 (emphasis in original; citation omitted).

"[A]lthough variations in state laws can present difficulties in certifying a litigation class under Rule 23(a), 'those variations are irrelevant to [the] certification of a settlement class.'"

---

160-1) *with* First Amended Consolidated Class Action Complaint, Ex. A (Dkt. No. 165).  Simply put, the Release does not release claims concerning "different products" as Mr. Lopez complains.

[14] To the extent Houser believes state law procedural rules prevent certification of a settlement class, she is wrong. Houser Objection at 3 ("For example, Alabama, Mississippi, Georgia, Montana, Iowa, South Carolina, Louisiana, Tennessee, and Virginia explicitly prohibit consumer class actions.").  State procedural rules have no application in federal cases when those rules conflict with the Federal Rules of Civil Procedure.  *See, e.g., Gold v. New York Life Ins. Co.*, 730 F.3d 137, 140 n.1 (2d Cir. 2013) ("[B]ecause federal law and not state procedural law governs class actions in federal court, New York law's prohibition on awarding statutory penalties in class actions [is] inapplicable to suits in federal court.") (citing *Shady Grove Orthopedic Associates. P.A. v. Allstate Insurance Company*, 559 U.S. 393, 130 S. Ct. 1431, 1438-40 (2010)).

*Gotthelf v. Toyota Motor Sales, U.S.A., Inc.*, 525 F. App'x 94, 102 (3d Cir. 2013) (citation omitted); *In re Nat'l Collegiate Athletic Ass'n Student-Athlete Concussion Injury Litig.*, 2016 WL 305380, at *14 (N.D. Ill. Jan. 26, 2016) ("variations in state laws are not obstacles to certification in the settlement context."); *Amchem*, 521 U.S. at 620 ("Confronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems....").[15]  Indeed, the choice-of-law issues raised by Houser demonstrate why the settlement here is fair, reasonable, and adequate.  *See Ko v. Natura Pet Products, Inc.*, 2012 WL 3945541, at *4 (N.D. Cal. Sept. 10, 2012) ("In addition, as Plaintiff notes, choice-of-law issues may render a potential class unmanageable such that no recovery would be possible without settlement.  Finally, further litigation would undoubtedly be time-consuming and expensive for both sides.  Accordingly, the Court finds that this factor weighs in favor of approving the settlement.").[16]

## V.   The Settlement Is Designed To Pay All Funds To Claimants

Houser also objects "[b]ecause the Settlement Agreement does not explain how unused settlement funds will be used to benefit Class Members, the Court should deny Final Approval." Houser Objection at 6.  However, the claims process is designed to pay out all funds to claimants.  Pursuant to the Settlement (Dkt. 160-1) at §2.10, any unpaid funds remaining from uncleared checks shall remain in the Settlement Fund pending further order of the Court.  If any unpaid funds from uncleared checks remain in the Settlement Fund, Class Counsel shall make an application to the Court for a proposed disposition of the unpaid funds.  Such proposed

---

[15] *In re Mex. Money Transfer Litig.*, 267 F.3d 743, 747 (7th Cir. 2001) ("Given the settlement, no one need draw fine lines among state-law theories of relief."); In *re AT&T Mobility Wireless Data Servs. Sales Tax Litig.*, 789 F. Supp.2d 935, 974 (N.D. Ill. 2011) (differences in state law do not defeat predominance for the purposes of certifying a settlement class); *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 298-99 (3d Cir. 2011) (certifying a settlement class despite the fact that variances in state law would likely have defeated predominance if the class was being certified for trial).

[16] Objector Nadola's objection should be overruled for the same reasons.  *See* Nadola Objection at 1 (Dkt. No. 188) ("The allocation of the settlement fund equally among consumers of all states is unfair because it does not account for differences in the strengths of the varying states' unfair trade practice statutes.").

17

disposition may not include any additional payment to Counsel.  Accordingly, as the parties expect no more than possibly a *de minimis* amout in the fund, no amount of the settlement has been allocated to *cy pres*.  And in any event, the disposition of any remaining funds will be determined by the Court.  *See In re Polyurethane Foam Antitrust Litig.*, 1:10 MD 2196, 2016 WL 320182, at \*14 (N.D. Ohio Jan. 27, 2016) (holding that the class notice did not need to identify a *cy pres* recipient because any *cy pres* distribution would be de minimus) (quoting *Klier v. Elf Atochem N. America, Inc*., 658 F.3d 468, 475 n. 15 (5th Cir.2011)).

## VI.   The Professional Objectors Incorrectly Assert That The Court Should Calculate A Percentage Fee On Less Than The Entire Common Fund

It is settled law that attorneys' fees are properly calculated as a percentage of the gross settlement fund.  *9-M Corp. v. Sprint Commc'ns Co. L.P.*, 2012 WL 5495905, at \*2 (D. Minn. Nov. 12, 2012) ("Under the percentage-of-the-fund method, it is appropriate to base the percentage on the gross cash benefits available for class members to claim, plus the additional benefits conferred on the class by the Settling Defendants' separate payment of attorney fees and expenses, and the expenses of administration.") (emphasis added). *See Barfield,* 2015 WL 3460346, at \*4 ("Thus, it is appropriate to base the percentage on the gross cash benefits available for class members to claim, plus the additional benefits conferred on the class by the KAMO Defendants' separate payment of attorneys' fees and expenses, and the expenses of administration.") (emphasis added).  Despite this, the Lopez objection takes issue with "class counsels' proposed request of attorneys' fees based on a percentage of the value of the settlement fund without deducting settlement administration fees of $1.4 million."  Lopez Objection at 9. Because, however, the gross settlement fund includes administrative fees and costs, this objection is baseless.

Similarly, while administrative fees are properly included as part of the gross settlement fund, they are not – as Professional Objectors Sweeney and Sibley contend – considered part of

18

the attorneys' fees.[17]  *Compare* Sweeney Objection at 1 ("I object to the Attorneys Fees of $8 million dollars, along with $1.4 million dollars of costs, expenses and settlement administrative fees.  This totals $9.4 million dollars which is almost 30 % of the settlement amount."), and Sibley Objection at 3 ("[T]he expenses should be included in the percentage and not added above the fee."), *with Smith v. Questar Capital Corp.*, 2015 WL 9860201, at *7 (D. Minn. Sept. 11, 2015) ("The Court has fully assessed and finds fair and reasonable the payment from the Settlement Fund of Class Counsel's attorneys' fees in the amount of $900,000.00 and Class Counsel's costs and expenses in the amount of $13,575.75 as requested in Class Counsel's motion seeking an award of attorneys' fees, costs and expenses. … In addition, the fees and expenses of the Settlement Administrator shall be paid from the Settlement Fund.").  Under the terms of the Settlement, the Settlement Administrator will be paid directly from the Settlement Fund, not from Class Counsel.  *See* Stipulation of Settlement ¶ 2.2(a) (Dkt. No. 160-1) ("all costs and payments associated with the Media Plan and administration of the Settlement Fund, including all payments to the Settlement Administrator, as described in paragraph 4.5 below"); *id.* ¶ 4.5 ("The actual costs and expenses of the Settlement Administrator will be paid from the Settlement Fund").

## VII.     The Objectors' Arguments For Application Of Anything Other Than The Eighth Circuit's 25% Benchmark Are Meritless

As explained in detail in the Plaintiffs' Application for Fees and Expenses, Dkt. No. 201, an award of 25 percent is supported by, and indeed is less than the potential recovery, under the prevailing law.  The Professional Objection arguments to the contrary are without merit or legal support.  *See e.g.,* Sibley Objection at 3 (the "Court should base the attorneys' fees on 20% of the actual class recovery" because the requested attorneys' fees of 25% "amount[] to unjust

---

[17] The Objection submitted by Ms. Combs makes a similar argument.  Combs Objection at 7 ("award attorney fees totaling a third of the overall settlement").

enrichment.").  As Mr. Sibley explained, however, his only basis for a 20 percent fee is that he "like[s] that number."[18]  Sibley Dep. at 82:1-3, Kravitz Decl., Ex. E ("Q:  But yet you suggest that the Court use a base of 20 percent of the actual recovery.  Why?  A:  Because I like that number.").  Despite urging the Court to "cross check the fee request using the Lodestar method," Sibley Objection at 3, Sibley nonetheless asserts "that no matter what that number is, that it should be 20 percent, not 25 percent."  Sibley Dep. at 85:3-6, Kravitz Decl., Ex. E; *see also id.* at 85:7-10 ("Q:  … So there's no amount of time and effort, in your mind, that could be presented by plaintiffs' class counsel that would justify a 25 percent fee?  A:  I don't think so.").  Given Sibley's flawed – indeed, wholly lacking – analysis, this objection should be rejected.  *See Marty v. Anheuser-Busch Companies, LLC*, 2015 WL 6391185, at *2 (S.D. Fla. Oct. 22, 2015)  ("Mr. Muller further claims that the proposed fee award is too large when compared to the actual pay out to class members who make claims.  A similar objection was recently rejected by the Eleventh Circuit in *Poertner* because it was 'based on [a] flawed valuation of the settlement pie[,] limiting the monetary value to the amount of [Defendant's] actual payouts,' while excluding the value of the injunctive and other negotiated relief.'  The Court rejects this objection on the same grounds.").[19]  However, as the Court already recognized, 25 percent is

---

[18] It is not hard to imagine why Mr. Sibley, an attorney Professional Objector, "likes" that number.  The motivation for him to take such a position is obvious: if he were to be able to take credit for a reduction in the amount of the otherwise entirely fair and reasonable fee request, it would enlarge the amount of the Settlement Fund available to claimants, and set him up to request a fee for himself for that service.

[19] Sweeney's objection on this ground is also baseless.  *See* Sweeney Objection at 1 ("The class should be protected from greedy attorneys…").  Sweeney testified that a 15% fee would be appropriate because "I think 30 percent is too high, and I think more should go to the class, and I think it's just too high."  Sweeney Dep. at 49:7-14, Kravitz Decl. Ex. D.  Such a conclusory basis is insufficient.  Moreover, Sweeney acknowledged that Judge Andersen is more qualified than her to determine the fairness of the settlement.  *See id.* at 68:3-6 ("Q:  Who do you think is more qualified to assess the fairness of the proposed settlement, you or Judge Anderson?  A:  Legally, Judge Anderson.").

McCoy's objection to the requested attorneys' fees should also be rejected as conclusory and speculative.  *See* McCoy Objection at 1 ("There is no way class counsel can justify receiving 25% of the $32 million settlement fund.  First, they haven't bothered to document their request.  Second, I assume they inflated their hours and/or the billable rates.  Finally, the result doesn't justify such an award (especially when you compare the fee to total claims actually paid).  All things considered, I think the fee should be no more than 15%.").

"less than a lot of cases."  *See* 12/15/16 Preliminary Approval Tr. at 13:14-16, Kravitz Decl. Ex.

__ ("THE COURT:  …  I'm not generally offended by 25 percent.  We all know that that's less

than a lot of cases."); *see also* Memorandum In Support of Plaintiffs' Application for Attorneys'

Fees and Expenses, Dkt. No. 201 ("Fee Application") at 7-8 (collecting cases awarding

attorneys' fees amounting to 25% or more of the common fund).

Moreover, at deposition, Ms. Houser testified that a reasonable way to compensate

attorneys for their work in this class would be by payment of "a percentage of the final."  *See*

Houser Trans at 74:19-75:2.  This testimony *directly contradicts* Ms. Houser's written Objection

(which she personally signed), wherein she objected that if final approval is granted, "the Court

should limit any fee award to Class Counsel's lodestar."  Houser Objection at 7.  Thus, it appears

that Ms. Houser's counsel – Professional Objector Attorney Jones, who drafted the written

objection – and Ms. Houser herself – may have different ideas about how fees should be

awarded. This testimony is a further indication that the Houser Objection is interposed for

purposes of delay and personal gain, and should be disregarded, particularly in light of Ms.

Houser's testimony that she didn't know *what* percentage would be fair.[20] In any event, and as

discussed at length in Plaintiffs' concurrently filed Motion for Attorneys' Fees, the attorneys'

fees in this case are best calculated as a percentage of the gross common fund.  *See* Fee

Application at 5-8**;** *see also Barfield*, 2015 WL 3460346, at *4 ("This [percentage of the fund]

calculation applies to the type of settlement presented here, where the KAMO Defendants will

pay the bulk of the gross value of the Settlement as a lump sum – none of which will be returned

to the KAMO Defendants – into a Settlement Fund out of which both class compensation and

attorneys' fees will be paid.").

---

[20] See Houser Deposition at 75: 3-7 ("Q: What do you think is a fair percentage of the 32 million? A: I don't know.
Q: Is 40 percent a fair percentage? A: I don't know."). Kravitz Supplemental Decl., Ex A.

## <u>CONCLUSION</u>

For the reasons stated above, the Court should overrule the objections and grant Plaintiffs'

Motion for Final Approval of Settlement and Settlement Class Certification, and Class Counsel's

Motion for Approval of Plaintiffs' Application for Attorneys' Fees and Expenses.

Dated: May 13, 2016

Respectfully submitted,

/s/ Scott A. Kamber
Scott A. Kamber (SK-5794,SDNY)
KamberLaw LLC
100 Wall Street 23rd floor
New York, NY 10005
P. (212) 920-3072
F. (212) 202-6364
skamber@kamberlaw.com

Deborah Kravitz, #275661CA
KamberLaw LLP
401 Center St., Suite 111
Healdsburg, CA
P. (707) 820-4247
F. (212) 202-6364
dkravitz@kamberlaw.com

*Interim Class Counsel and Chair of the Plaintiffs'
Executive Committee*

/s/ John G. Simon
The Simon Law Firm, P.C.
John G. Simon, #35231MO
800 Market Street, 17th FL
St. Louis, Missouri 63101
P. (314) 241-2929
F. (314) 241-2029
jsimon@simonlawpc.com
*Liaison Counsel and Member Plaintiffs' Executive
Committee*

Gray, Ritter & Graham, P.C.
Don M. Downing #30405MO
701 Market Street, Suite 800
St. Louis, MO 63101-1826
P. (314) 241-5620, ext. 2006
F. (314) 241-4140

22

ddowning@grgpc.com

Bursor & Fisher, P.A.
Joseph I. Marchese
Frederick J. Klorczyk, III
888 Seventh Ave.
New York, NY 10019
P. 646-837-7410
F. 212-989-9163
jmarchese@bursor.com
fklorczyk@bursor.com

Steelman, Gaunt & Horsefield
David Steelman, #27334MO
901 N Pine St
Rolla, MO 6540
P. (573) 341-8336
F. (573) 341.8548
dsteelman@steelmanandgaunt.com

*Members of Plaintiffs' Executive Committee*

## CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that on May 13, 2016 the foregoing was filed electronically with the Clerk of Court to be served by operation of the Court's electronic filing system upon all counsel of record.

By:      /s/ John G. Simon
Counsel for Plaintiffs